Pages 1 - 27

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, MAGISTRATE

KIRBY MARTENSEN,                     )
                                     )
            Plaintiff,               )
                                     )
  VS.                                ) NO. C 12-5257 JSC
                                     )
WILLIAM KOCH, et al.,                )
                                     )  San Francisco, California
            Defendants.              )  Thursday
                                     )  February 28, 2013
_____)  9:29 a.m.

                    TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          SCOTT LAW FIRM
                        1388 Sutter Street
                        Suite 715
                        San Francisco, California  94109
                 BY:    JOHN HOUSTON SCOTT, ESQ.
                        and
                        GEARINGER LAW GROUP
                        825 Van Ness Avenue
                        Fourth Floor
                        San Francisco, California  94109
                 BY:    BRIAN GEARINGER, ESQ.

For Defendant Koch:     IRELL & MANELLA, LLP
                        1800 Avenue of the Stars
                        Suite 900
                        Los Angeles, California  90067-4276
                 BY:    JOHN CHARLES HUESTON, ESQ.


Reported by:            BELLE BALL, CSR #8785, CRR, RDR
                        Official Reporter, U.S. District Court

1   **THURSDAY, FEBRUARY 28, 2013**          9:29 A.M.

2                <u>P R O C E E D I N G S</u>

3        **THE CLERK:**  C 12-5257, Martensen versus Koch.

4        **MR. HUESTON:**  Good morning, Your Honor.  John Hueston

5   on behalf of Defendant William Koch.

6        **THE COURT:**  Good morning, Mr. Hueston.

7        **MR. SCOTT:**  Good morning, Your Honor.  John Scott

8   appearing with Brian Gearinger for the Plaintiff, Kirby

9   Martensen.

10        **THE COURT:**  Good morning.  So, is it -- is it

11   pronounced "Coke"?

12        **MR. HUESTON:**  Yes, Your Honor.

13        **THE COURT:**  Thank you.  I always mispronounce it.

14    So, it seems to me in looking at this, that the issue kind

15   of comes down to for everything -- personal jurisdiction,

16   venue, 12(b)(6) -- as to the Plaintiff's allegations that the

17   confinement continued into California.  Right?

18    So I guess I would say, Mr. Hueston, if Mr. Koch was

19   actually on the plane that brought Mr. Martensen back to

20   California, would you still say there's no personal

21   jurisdiction?

22    It doesn't even have to be the pilot, he's on the plane.

23        **MR. HUESTON:**  Your Honor, yes.  I would say there's

24   no personal jurisdiction.

25    Because when you look at personal jurisdiction, first of

1   all, the only allegation of the complaint is that he's a

2   resident of Florida.  And when you look at all the items that

3   Plaintiff suggests they will bring into the amended complaint,

4   they're all things that are irrelevant.

5        Lawsuits on behalf of Oxbow, those are not related to this

6   lawsuit.  Case law says --

7             **THE COURT:**  I agree with that.

8             **MR. HUESTON:**  Okay.

9             **THE COURT:**  I'll agree with that.  I'll get to the

10  rub of it, which is in all the cases you cite, you sort of did

11  the purposeful direction.

12       It seems to me the allegations of the complaint are -- or

13  at least what the proposed amended complaint would be -- is

14  that the confinement continued into California.  So that the

15  tort -- this is all just based on the allegations and drawing

16  the inferences in Plaintiff's favor -- so that the tort

17  continued into California.

18       For example, if somebody -- I'm not saying -- I don't mean

19  to equate the allegations of this case to that -- was

20  kidnapped, kidnapped somebody, and then went to Reno, you know,

21  there would be jurisdiction in Reno to prosecute that, because

22  it was continued into Reno.

23       Seems to me the allegations are tantamount to that.  I

24  don't mean to equate it, but are similar to that, in that the

25  allegation is that the false imprisonment continued into

1  California.  And so the tort actually occurred here, through

2  Mr. Koch's agents.

3       **MR. HUESTON:**  Well, Your Honor, first of all, the

4  tort is alleged -- and even when they say they're going to put

5  on another case, the tort as alleged is in Colorado.  They say

6  he was confined in a cabin, and eventually he's put on a plane,

7  and he's deposited in Oakland.

8       **THE COURT:**  But, no, they allege more than that.

9  They allege, actually -- and I think it's a key allegation --

10  is that he asked to be taken to Aspen to get on his

11  public-carrier flight.

12      He was told no, and he was forced -- at least, drawing the

13  inferences in the Plaintiff's favor, which I have to do --

14  forced to get on a private plane in Denver.

15      Right?  In Denver?

16      **MR. SCOTT:**  Yes.

17      **THE COURT:**  And then flown in a private plane.  I

18  mean, the confinement continues.  He's on some plane that he

19  didn't want to be on, that he didn't ask to be put on, and

20  flown into California.

21      **MR. HUESTON:**  Your Honor, the key -- you are -- you

22  should properly consider his declaration, which he submitted.

23      And, I submit to you, when he said that he found a phone,

24  a cell phone, and had it before this string of so-called

25  false-imprisonment events took place -- he said he got the

1  phone before he went into the cabin, and that's where the false

2  imprisonment began.

3          **THE COURT:**  Uh-huh.

4          **MR. HUESTON:**  He was free to dial his way to 911;

5  say, "I'd like new transportation to take me to Aspen."  He

6  does none of that.

7      Your Honor, this is --

8          **THE COURT:**  Why would he dial 911 when he says

9  there's a police officer standing right there, making sure he

10 doesn't go anywhere?

11         **MR. HUESTON:**  Well --

12         **THE COURT:**  Who's going to come?

13         **MR. HUESTON:**  Call the FBI, call anyone.  These are

14 all supposed agents, he says, of Mr. Koch.

15         **THE COURT:**  Do you have any cases that say if you're

16 given a phone, that you're no longer under confinement?

17     I mean, let's look at arrest cases, if you're under

18 arrest.  They always say, "You have the right, you can call

19 your lawyer right now."  You're still under arrest; you still

20 can't leave.

21         **MR. HUESTON:**  Your Honor, in this electronic era, the

22 idea of saying in this situation that "I'm confined" is the

23 equivalent of saying "The cage in which I'm imprisoned had an

24 open door, but I didn't want to leave through the open door

25 because I was afraid I was going to get followed."

1        That's what he said in his papers, that, "Well, I didn't

2    want to use it because somebody might have followed me through

3    GPS, or otherwise."

4        That just simply makes no sense at all.

5        **THE COURT:**  So, as a matter of law, I can conclude,

6    just based on that allegation of law, that there's no

7    possibility, there's no facts that he could ever come up with

8    that would allow a jury to find he was confined.

9        **MR. HUESTON:**  Yes, Your Honor.  That he, with that

10   device, which was his avenue to freedom if he truly felt he was

11   imprisoned, he cannot allege under any circumstances that he

12   was falsely imprisoned.  He simply wasn't.

13       **THE COURT:**  I find that to be a really remarkable

14   proposition on 12(b)(6).  Do you have a case?

15       **MR. HUESTON:**  Your Honor, I don't have a case

16   directly on point, but I think in this era with people with --

17   if it were a laptop with Internet access or a cell phone, it's

18   the equivalent of you're in a room and the door is open, or

19   it's not locked and you know it, and you can walk out.

20       That could never be false imprisonment.

21       **THE COURT:**  Well, that's not true.  In fact, I can

22   tell you, when I was an attorney, I defended somebody who was

23   convicted criminally of false imprisonment when the person was

24   left alone in the apartment all day, every day, for a year.

25   Because it's the fear that they can't leave, or what's going to

1  happen if they leave that creates the false imprisonment.

2      Here, the allegations -- just drawing all the allegations,

3  he's on some remote private property that you can't get -- no

4  -- it's not open to the public, he's driven in there,

5  there's -- there's, like, several people bringing him around,

6  and he's -- he's told -- isn't he told -- what's the

7  allegation?

8           **MR. SCOTT:**  He's told --

9           **THE COURT:**  Not to leave the cabin?

10          **MR. SCOTT:**  He was told the police officer was

11 present to make sure he did not wander off.

12          **THE COURT:**  Yeah.  I mean, I have to draw all

13 inferences in the Plaintiff's favor.  I'm not saying that is

14 how they come out, but I have to draw it.

15     I can't -- I would be reversed in a nanosecond if I was to

16 say that doesn't -- that can't be false imprisonment as a

17 matter of law.

18     There's just no support for that, at this stage in the

19 proceedings.  Maybe down the line, on summary judgment, or

20 maybe to a jury that would be persuasive.  But I can't -- I

21 can't draw that here.

22          **MR. HUESTON:**  The facts go beyond that.  I mean, if

23 you were to bring in this Colorado Bureau of Investigation

24 report -- which, as a former prosecutor, I never got to bring

25 in my FBI reports as evidence.

```
 1        But if you did, it talks about the so-called sheriff

 2   that's holding him in is reading a book, doesn't even know why

 3   he's there.

 4        I mean, there's just nothing even in what they want to

 5   bring in in extrinsic facts, when you couple it with the cell

 6   phone, that could ever amount to false imprisonment.  It's

 7   simply a frivolous case at its heart.

 8        But, Your Honor, going beyond that, let's just put that

 9   aside for a moment.

10             THE COURT:  Well, let me stop you right at it's

11   frivolous at its heart.  I don't understand.

12        The allegation is that he said, "I want to go to Aspen to

13   get on my plane that I have previously looked booked."

14        And he's told "No."  He's put in a SUV, and put on a

15   private plane.

16        I mean, that -- maybe you think it's implausible, that

17   didn't happen; I don't know.  But that's the allegation that is

18   made.

19        How is that not some sort of false imprisonment?

20             MR. HUESTON:  Your Honor, he gave a direction to get

21   driven to a certain point, you know, in the geographic area.

22   And someone says, "No, I'm not going to drive you there";

23   that's false imprisonment?  That's ridiculous.

24        He was brought to a point of exit so he could be

25   deposited, as he was, back to his home.
```

1      **THE COURT:**  But he was put on a plane he didn't want

2  to get on.  On a private plane.  He had a ticket -- the

3  allegation is he had a ticket out of Aspen, on a regular

4  carrier.

5      **MR. HUESTON:**  Again, he had his phone.  He could have

6  called for assistance.

7      And, and again, let's think beyond this.  This isn't --

8  there isn't even an allegation of Mr. Koch being in the middle

9  of this.  There's no allegation of Koch here, being involved.

10  They've conceded that.  The agency allegations are facially

11  deficient; they've conceded that.

12      The conspiracy allegation is wholly lacking.  He says you

13  should draw inferences.  *Twombly* and *Iqbal* say:  Of course not.

14  That has to be concretely set forth.

15      And under the 1983 allegations, the idea that Mr. Koch was

16  somehow conspiring with law enforcement, there is absolutely no

17  evidence of that.  And the extrinsic evidence -- which,

18  frankly, shouldn't come in -- shows the opposite.

19      **THE COURT:**  Well, no, there's n- -- so, it's clear

20  that there's not any -- so the motion to dismiss is based -- is

21  -- is -- you haven't asked for an evidentiary hearing on

22  personal jurisdiction.

23      What we're dealing with is whether there's a pri- -- where

24  the allegations, drawing the inferences in the Plaintiff's

25  favor, make a *prima facie* showing of personal jurisdiction.

1    Right?

2        So all -- as I take it, the evidence that they've offered

3    is simply a proffer as to what they would allege in an amended

4    complaint.  That's what we're talking about at this point.

5             **MR. HUESTON:**  Right.  Right.

6             **THE COURT:**  So, it's not whether I would allow, you

7    know, admissible -- just -- report or anything like that.  He's

8    just using it as a basis:  "This is what I'm going to allege

9    and this is why I'm going to" --

10            **MR. HUESTON:**  I understand.

11            **THE COURT:**  -- "allege it."

12            **MR. HUESTON:**  Right.

13            **THE COURT:**  Now, the questions as to agency, I don't

14   know, frankly, given the story that it -- it seems to me almost

15   implausible that they weren't acting as Mr. Koch's agents.

16      I mean, Mr. Koch -- he arrives, he's told, "Come for this

17   weekend retreat, business meeting."  At Mr. Koch's invitation.

18            **MR. HUESTON:**  Yes.

19            **THE COURT:**  Mr. Koch meets him at the airport.

20   Mr. Koch gives him lunch at his home.

21      (Reporter interruption)

22            **THE COURT:**  And then, he has lunch at Mr. Koch's

23   house.  And then, and then, he gets a tour.  Then they're

24   brought to the private property, which is not open to the

25   public.  By Mr. Koch.

```
 1              MR. HUESTON:  It's all within the private property.

 2  But yes, Your Honor.

 3              THE COURT:  The home as well.  Okay.

 4              MR. HUESTON:  Uh-huh.

 5              THE COURT:  And then, he -- and then, they have

 6  another lunch, and then Mr. Koch says to Mr. Martensen, "You're

 7  going to be interviewed for this 360 peer review."

 8              MR. HUESTON:  Right.

 9              THE COURT:  And so, he goes to the interview, and

10  that's not what it is.

11              MR. HUESTON:  Uh-huh.

12              THE COURT:  What it is is he's interrogated,

13  according to the allegations in the complaint.

14              MR. HUESTON:  Right.

15              THE COURT:  He's interrogated for three hours about

16  misconduct that he's accused by being done.

17              MR. HUESTON:  Right.

18              THE COURT:  At that point, of course, there's an

19  inference that Mr. Koch knows exactly what's going on, that

20  that wasn't a 360 peer review --

21              MR. HUESTON:  Right.

22              THE COURT:  -- that it was going to be that.  And at

23  that point he's put in an SUV, handed his termination papers.

24  Again, the inference is -- the inference, a plausible

25  inference, that Mr. Koch knows all this is going to happen.
```

 1      And then, and then he's brought -- then he's brought to

 2   get his stuff out of the house where he's staying, and then

 3   brought and told to stay in the cabin, where he's left for

 4   three hours.  And there's a police officer or sheriff, I can't

 5   remember, sitting there.  And then taken to a private plane and

 6   flown home.

 7      Now, I agree with you.  There could be an inference, or

 8   the evidence could ultimately show that Mr. Koch didn't know

 9   anything about that.  That whoever put him on the private plane

10   or had him stay in the cabin, he had no idea any of that was

11   going to happen.

12      But, there's also an inference that can be drawn from that

13   that he knew exactly that was going to happen.  That the

14   weekend was a setup -- that the weekend business meeting was a

15   setup; the intent was always to terminate --

16           **MR. HUESTON:**  Right.

17           **THE COURT:**  -- Mr. Martensen.  And because, you know,

18   I guess the -- the explanation would be because of concerns,

19   how people sometimes act when they're fired, in particular if

20   you think they've been defrauding you --

21           **MR. HUESTON:**  Uh-huh.

22           **THE COURT:**  -- for a while, they took measures which

23   included not allowing him to wander off, or get on the plane,

24   or whatever.  The question would be whether that's legal or

25   not.  I don't -- I don't know.

1    But, to say there's no inference to be drawn from that,

2  that Mr. Koch -- that these weren't -- people weren't operating

3  under his agents, that I don't see.

4          **MR. HUESTON:**   Okay.  Well, let me have a chance to

5  respond.  So, almost everything you described, Your Honor, is

6  not actionable.  It's not false imprisonment.  He came

7  willingly to the property.

8    Let's just go with -- you know, Mr. Koch (sic) understands

9  that he's going to be questioned.  This is an employee

10  interview.  He's not told in advance whats happening.  These

11  kinds of interviews happen all the time.

12    And there's case law, and we cited it, where simply

13  because they're brought in and told, "We're going to ask you

14  now about things, alleged fraud," that's not false

15  imprisonment.  Nothing improper about that.  Nothing improper

16  about a ruse.

17    He sits there, and there isn't a single allegation that:

18  "I tried to get up from the interview and get out, and they

19  didn't let me."

20    He sat there and lied, and tried to B.S. his way out of

21  it.  Didn't work.  And then it was time for him to go.

22    There's no inference -- the one fact that Your Honor seems

23  to be troubled by is at one point, he says, "I would prefer

24  Denver" -- or, "Aspen over Denver."

25    And he's told, "We're driving you to Denver."

1      There's absolutely no inference that can be drawn that

2   Mr. Koch somehow was calling some shot from a command central,

3   saying, "No.  He must leave from Denver rather than Aspen."

4      And, more importantly, Your Honor, I think that the

5   pleading standards under *Twombly* and *Iqbal* make you –– and

6   rightfully so –– allege concrete facts that actually set this

7   sort of thing out, if it's true.

8      It's simply absurd that he would have been dictating that.

9   There is no logical inference to that.  That's the issue I

10  think that has troubled Your Honor.

11     The final depositing in Oakland doesn't appear to be a

12  point of complaint.  It was the point of departure, either

13  Aspen or Denver, with somebody who had a cell phone, who took

14  no action with it.

15     That's the factual heartland of the case, before we've

16  even gotten to issues such as venue where Plaintiff says, you

17  know, "Whoops, we have an adequately alleged venue.  I just

18  need to add the word 'substantial' to it."

19     That doesn't cure the fact that everything he describes

20  that is of issue for him is allegedly happening in Colorado.

21     He is dropped in California.  There is no way that that

22  can be viewed as a substantial part of the alleged imprisonment

23  case.  It simply isn't.

24     And for that reason, it shouldn't proceed, as well.

25          **THE COURT:**  All right.  Let me hear from Mr. Scott.

1          **MR. SCOTT:**  Your Honor, I just want to comment on a

2     couple of things.

3          All of these events occurred on Mr. Koch's private ranch,

4     until my client was put in a SUV and taken to Denver.  The only

5     reasonable inference is that on his private ranch, all the

6     persons there were acting as his agents, with his knowledge and

7     consent and his authorization.

8          It's the only reasonable conclusion one can come to.

9     There's no -- they certainly aren't arguing that there were

10    people acting here who were not his agents.

11         It's hard to imagine that any of these people involved in

12    this course of events that started on his private ranch and

13    ended in Oakland were not his agents.  Maybe they can prove

14    they weren't, but that's the reasonable inference, number one.

15         Number two, we're alleging that the -- the false

16    imprisonment didn't begin until after he was terminated, after

17    the interrogation.  When he was driving -- being taken back to

18    the cabin, first to get his belongings to put in the cabin.  At

19    that point, he was handed a notice of his termination.

20         He was also handed a summons and complaint of a lawsuit

21    that was filed in Florida that day.  Now, that lawsuit wasn't

22    just written and filed in a day.  He knew.  I mean, this was

23    calculated.  "We're going to fire him, and then after he's

24    fired, we're going to serve him with a summons and complaint."

25         And we chose -- I mean, what is the motive here?  I mean,

1  this lawsuit has to do with his alleged misconduct that he did

2  in California.  When he was working for Oxbow and Mr. Koch in

3  California.

4      Last but not least, the phone issue.  I mean, I was --

5  I've done some prison litigation, maybe more than I care to

6  remember.  But, it's not unusual for prisoners to get cell

7  phones in jails and prisons.

8      Is Mr. Hueston suggesting that all you have to do is get a

9  cell phone, and maybe if it's a smart phone, then you're really

10 free to someone in jail or in prison, and he's no longer

11 unlawfully confined?

12     I mean, it's ridiculous.

13          **MR. HUESTON:**  Your Honor, may I respond?

14          **THE COURT:**  Yes.

15          **MR. HUESTON:**  So, just like he does in the papers, he

16 says we're properly here -- I'm inferring from his argument --

17 in California because his misconduct, his stealing from the

18 company he alleges happened in California and elsewhere.

19     The law clearly says you look at the complaint and what's

20 filed here.  This is a false-imprisonment case.  And, that

21 attempt to gerrymander venue here is just simply wrong, as a

22 matter of law.

23     He's attempting it because he knows he doesn't have enough

24 facts to provide a substantial basis for venue here.

25          **THE COURT:**  But, he says he wants to amend his

1  complaint.  Why wouldn't I allow him to amend his complaint?

2          MR. HUESTON:  Because everything he's proffered to

3  amend is going to be futile, Your Honor.  He's already outlined

4  exactly how he's going to try to do it.

5          THE COURT:  What if the confinement continued into

6  California?  What if a reasonable trier of fact could find the

7  confinement, drawing all inferences in favor, continued into

8  California?

9          MR. HUESTON:  Well, yes, at the very least, venue

10  would be improper.  A substantial part of what is alleged did

11  not occur in California.

12      In that instance, I would be inclined to ask the Court to

13  dismiss, with leave to refile in either Colorado or Florida.

14  That's the appropriate answer here.

15          THE COURT:  Why Florida?  I mean, nothing happened in

16  Florida.

17          MR. HUESTON:  Well, there are more ties there than

18  here.

19          THE COURT:  How?  He lives here.  He was brought

20  here.  The confinement ended here.  I mean, Florida has no ties

21  to this case at all.

22          MR. HUESTON:  Well, he's alleged he has counsel

23  there.  He's actually litigating these same facts there.

24      And, he concedes that Colorado is a perfectly fine place

25  to go.  And clearly, there's where the weight of all of this,

1   if you accept all these allegations, occurred.

2        This effort to sort of discuss other things in California

3   is completely irrelevant.

4            **THE COURT:**   It's clear that if the test were where

5   the majority or the bulk or whatever, that would be Colorado.

6   There is no question that venue is proper in Colorado.

7        The question is what does "a substantial part" mean.  And,

8   does the tort continuing into California, I guess you would

9   argue -- other arguments giving that he was living here -- at

10  least he alleges he was living here, at the time, and so, the

11  effects -- I don't know if it's effects as much as the tort

12  continued into California, whether that's enough.

13           **MR. HUESTON:**   Your Honor --

14           **THE COURT:**   I understand your argument, you don't

15  think there's any confinement.  I can't find that, obviously --

16           **MR. HUESTON:**   Even if there was -- okay.  Even if

17  there was confinement, at most, he has a jet going into

18  California air space, landing in Oakland, which is the vicinity

19  of where he lives.  He walks off, and leaves.  That's never

20  going to be a substantial part of the narrative in which he's

21  alleged.

22        So, coming back here to San Francisco is futile.  This

23  should not be -- if this is going to go on -- be dismissed and

24  represented.  It shouldn't be represented in this forum.

25           This is not the right place.  This was forum selection and

1   shopping by this former employee.  And it was improper.

2        **THE COURT:**  Well, he lives there.  It's not that

3   there is no -- he lives here.  This is where the Plaintiff

4   lives.  This is where he lived when he was doing all that work,

5   as Mr. Scott said, that the Defendant alleges, where he was

6   cheating the company.

7        This is where he traveled from, at the request of

8   Mr. Koch, to go to the thing.  And this is where, taking the

9   allegations as true, where his confinement ended.

10        **MR. HUESTON:**  Correct.  Taking all that as true, yes.

11   Still, you have, at most, a small stub of a tail that they are

12   attempting to wag an entire dog, which is in Colorado.

13        That's where this -- if you give them all, we'll be -- if

14   we have to come back again, that's -- everything he's tried to

15   do, they've actually gone to pains to show you how they're

16   going to amend the complaint.

17        That's what it's going to end up as, Your Honor.

18        **THE COURT:**  All right.  Well, I'm going to grant him

19   leave to amend the complaint.  I think that -- but I'll go back

20   and think about the venue a little bit more.

21        I think, if -- I think, based on the allegation of the

22   confinement continuing here -- I mean, I guess I'll have to see

23   his amended complaint.  But I certainly think that it's

24   plausible he can allege that the people who brought him here

25   were Mr. Koch's agents.  And, I think I just need to look at

1   the "substantial."

2       I understand your argument that even if the confinement

3   ended here, that wouldn't be a sufficient substantial part.

4   But certainly, on everything else, I would be inclined to grant

5   leave to amend, and the other arguments.  Probably on that as

6   well, but I'll go back and think about that a little bit.

7       Now, what we need to do, though, is set a case management

8   conference date, because we had moved that.

9           MR. SCOTT:  Correct, Your Honor.  And in addition, I

10  would like the Court to consider an early date for Rule 26

11  disclosures, and also potentially limited discovery commencing

12  immediately on the issue of jurisdiction and venue.

13          THE COURT:  Well, so, you only need that if we are

14  going to do -- so, there's two different ways to attack

15  jurisdiction and venue.

16          MR. SCOTT:  Right.

17          THE COURT:  Right?  There's one that -- which is how

18  I understand their attack, which is that you haven't made your

19  *prima facie* showing, just based on the allegations.

20          MR. SCOTT:  Okay.

21          THE COURT:  Okay?  And the second is, "No, we want an

22  evidentiary hearing and need the Court to actually make

23  findings, whether..."

24      They haven't made that argument.  And that would be a

25  completely different analysis, because if resolving those facts

1  actually resolved to a large extent the merits of the case, we

2  don't do it separately, because that's redundant.  Then you're

3  deciding the case on the jurisdiction.

4          MR. SCOTT:  All right.

5          THE COURT:  So, I think it's premature.  We don't

6  need jurisdictional discovery.  Let's do the *prima facie*

7  showing.

8          MR. SCOTT:  Fair enough.

9          THE COURT:  I'm not making findings based on the

10  evidence.

11      So, for example, Mr. Koch submitted a declaration, said "I

12  didn't know he lived there."  You've made allegations that

13  raise an inference that he did.

14      I accept those allegations, because I'm not -- no one's

15  asked for -- I'm not having an evidentiary hearing with

16  Mr. Koch here, where I would, you know, assess his credibility.

17      So, but I do think we need a case management conference

18  date.  And, you know, you'll file -- how quickly can you file

19  your amended complaint?

20          MR. SCOTT:  I would like two weeks.

21          THE COURT:  Two weeks?  Sure.

22          MR. HUESTON:  We need a briefing schedule to --

23          THE COURT:  You can't -- I want to tell you,

24  candidly, I think they'll probably -- but, I'll go the venue,

25  the venue thing I think about.  But the allegations, I think,

1    will be sufficient to allege the confinement.

2        I don't buy the cell phone thing.  I don't think --

3    there's just no precedent for that on a motion to dismiss for

4    me being able to conclude, based on these allegations, that

5    there's no possible way he could be found to have been

6    confined.

7            **MR. HUESTON:**  On the issue of that, the pleading

8    stage.

9            **THE COURT:**  Right.

10           **MR. HUESTON:**  I've made my argument on that,

11   Your Honor.  But we certainly still want the opportunity --

12   he'll bring it back, you can think about it again.  Thank you

13   for doing that on venue.

14       We will want to answer and attack that again.  We see say

15   what he alleges.  It's going to be "Plane goes through air

16   space for 20 minutes."

17       And, we will thoroughly brief the idea and the notion that

18   that's certainly not substantial.  The word would really have

19   no meaning, if that's going to be what is sufficient to bring a

20   case in this district properly.

21       So, we are going to want to deal with venue.  This is not

22   the right venue, in our view.  And I feel strongly about that.

23   And there are still jurisdiction issues that we're going to

24   want to attack.

25       I've been guessing at what his amended complaint will look

1  like.  Again, with everything put in there, it doesn't appear

2  sufficient, as a matter of law.  So it will be important to see

3  what's there, so we have adequate time to brief and argue this

4  again, Your Honor.

5           **THE COURT:**  Let me ask you, Mr. Hueston, because you

6  made the mistake of telling me you're a former prosecutor.

7       In the criminal context, if, for example, there's a

8  kidnapping, and then someone is brought from one jurisdiction

9  and then just ends in another, doesn't that other jurisdiction

10  have -- have the jurisdiction to prosecute that crime?

11       For example, if there's a murder, and then the body is

12  brought, say, from San Francisco to San Mateo, and the body is

13  just deposited in San Mateo.  So, everything happened in

14  San Francisco.

15       I'm not saying equating, I'm just wondering.

16           **MR. HUESTON:**  Right, right, right.  Your Honor, I

17  believe -- and I will look at this --

18           **THE COURT:**  It doesn't matter.

19           **MR. HUESTON:**  Well, no, the criminal rules are

20  different.  And as a prosecutor, we would have cases where

21  there would be a fraud.

22       And the classic example -- I don't know if you were a

23  prosecutor.  Southern District of New York would have one

24  mailing in New York, and everything would happen elsewhere, and

25  they would bring it criminally in New York.

1      Civil system works differently.  There are reasons why the

2    civil sphere operates differently, you know, different

3    discovery rules.  And I think here, we have a Ninth Circuit

4    test, applies in the civil arena here.

5      And it says it's got to be a substantial part.  Not

6    minimal and slight, which, as I recall from my criminal days,

7    it was a very minimal showing.

8            **THE COURT:**  Okay.  All right.  That's -- I was just

9    wondering about that.

10           **MR. HUESTON:**  Happy to dig back into that past.

11           **THE COURT:**  Like you said, it doesn't matter.  Just

12    matters what the civil test is.

13      So, I think -- so --

14           **MR. SCOTT:**  Let's get a CMC date.

15           **THE COURT:**  I understand.  Well, let's build it.

16    Let's do the CMC date as the same day as their hearing.  I

17    mean, they do get an opportunity to attack, if they want to

18    attack your revised pleading.

19           **MR. SCOTT:**  Oh.  It hurts so good.

20           **THE COURT:**  So, but let's make the CMC the same date.

21    So we can -- you can believe in your pleading that you're going

22    to win, and maybe you will.

23      But in the meantime, it's not a lot of work to do what you

24    need do in advance of the CMC, in case the case stays here, to

25    plan, you know, what your dates would be.  Meet and confer on

1  that, and do the initial disclosure.

2  **MR. SCOTT:**  Initial disclosures would be in advance

3  of the CMC?

4  **THE COURT:**  What do the rules say?  When are they

5  supposed to be?

6  **MR. SCOTT:**  They're usually about two weeks before

7  the CMC.

8  **THE COURT:**  Whatever the rules say.

9  **MR. SCOTT:**  Filing a joint pretrial -- I mean, a

10  joint CMC statement and the Rule 26 disclosures typically a

11  week or two before the CMC.

12  **MR. HUESTON:**  Well, Your Honor, if he's going to push

13  that, then I'd ask that the CMC not be held on the date of the

14  hearing of the motion to dismiss.

15  We shouldn't be compelled to start going through discovery

16  and going through discovery processes when we feel we have a

17  good-faith basis this -- this complaint is dismissed today.  He

18  has a chance to bring it back.  We should not be moving into

19  discovery.

20  I'll agree to a reasonable briefing schedule.  But we

21  would have the right, I think, to get to that hearing without

22  having to go through the pains and expense of discovery --

23  **THE COURT:**  No, no.  It's not discovery; it's just

24  initial disclosures.  Which, by the way, what I have told you

25  is I think the allegations are sufficient to allege false

1   imprisonment.

2        What we are talking about is whether the case would be

3   here or somewhere else.  So there is no prejudice to producing

4   your initial disclosures, because you've got to do them --

5             **MR. SCOTT:**  No matter where you are.

6             **THE COURT:**  -- no matter where you are, here or

7   there.  We're not talking about depositions, or anything like

8   that.  We're just talking about the initial disclosures.

9        What the Federal Rules contemplate in every case, you just

10  have to produce right off the bat, because those are just the

11  basic things that you have to do at the beginning.

12       So, I don't think there's any prejudice from that.  It's

13  not -- respectfully, I just don't find it's a case that's just

14  going to go away.  What we are really fighting about is where

15  it's going to be.

16       So, if you file in two weeks, on -- let's see.  That would

17  be March 14th.  Then you would want how much time, a couple of

18  weeks to file your motion to dismiss?

19             **MR. HUESTON:**  Yes.  We would need two weeks,

20  Your Honor.

21             **THE COURT:**  So that would be March 28, April 11, and

22  then -- how much time for your opposition?  Two weeks?

23             **MR. SCOTT:**  Two weeks would be fine.

24             **THE COURT:**  April 11.  So then we'd have a hearing on

25  April 25th.

1          **MR. HUESTON:**  That's fine, Your Honor.

2          **THE COURT:**  So what I'm going to do, Mr. Scott, since

3  you volunteered in your opposition to want to amend the

4  complaint, I'll just grant their motion with leave to amend.

5          **MR. SCOTT:**  Thank you.

6          **THE COURT:**  I won't issue a written opinion or

7  anything like that.  And I'll do that after the next time we

8  come around.  But I've given you some guidance, at least, to

9  what the Court's tentative views are.

10          **MR. HUESTON:**  Yes, Your Honor.  And we will also be

11  focusing on the venue issue, as well.

12          **THE COURT:**  Okay.  Then we'll see you back here on

13  April 25th for the hearing, and also a CMC then.

14          **MR. HUESTON:**  Great.  Thank you, Your Honor.

15          **MR. SCOTT:**  Thank you.

16      (Conclusion of Proceedings)

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

      I, BELLE BALL, Official Reporter for the United States

Court, Northern District of California, hereby certify that the

foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.

      /s/  Belle Ball

      Friday, March 8, 2013

      Belle Ball, CSR 8785, CRR, RDR