1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

KIRBY MARTENSEN,

             Plaintiff,

     v.

WILLIAM KOCH and DOES 1-25,
inclusive,

             Defendant.

Case No.: C-12-05257 JSC

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT'S
MOTION TO DISMISS; DENYING
DEFENDANT'S MOTION TO
STRIKE**

This action involves the alleged false imprisonment of Kirby Martensen ("Plaintiff") by William Koch ("Defendant") and other unnamed parties. Now pending before the Court are Defendant's motions to (1) dismiss Plaintiff's First Amended Complaint ("FAC") (i) under Rule 12(b)(3) for improper venue, or in the alternative, to transfer the case under 28 U.S.C. § 1404(a); (ii) under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction; and (iii) under Rule 12(b)(6) for failure to state a claim for relief; and (2) strike Plaintiffs' punitive damages allegations under Federal Rule of Civil Procedure 12(f) ("Motions"). (Dkt. No. 39.) After carefully considering the parties' pleadings on the Motions, and having the benefit of oral argument on April 25, 2013, the

1  Court GRANTS in part and DENIES in part the Motion to Dismiss and DENIES the Motion to

2  Strike.

3  **ALLEGATIONS OF THE FAC**

4  Until March 22, 2012, Plaintiff, a resident of Berkeley, California, was an executive

5  employee of companies owned and/or controlled by Defendant, including OxBow Carbon &

6  Minerals, Inc. ("OCM"), and Oxbow Carbon & Minerals International ("OCM International").

7  OCM and OCM International sell a significant amount of petroleum coke and steam coal throughout

8  Asia, shipping millions of metric tons of product to that region each year.  In late 2011, Plaintiff was

9  promoted to the position of Senior Vice President-Asia with OCM International, and relocated to

10  OCM International's Singapore office.  Plaintiff came to believe that the company's business efforts

11  in Asia included implementing a plan to evade paying taxes to the United States on profits in excess

12  of $200,000,000 per year.

13  Sometime in 2011, Defendant was notified of an anonymous letter alleging that Plaintiff and

14  another employee, Larry Black, had been engaging in theft, breaches of fiduciary duty, fraud, and

15  self-dealing against the Oxbow companies.  Based on this information, Defendant directed a

16  comprehensive forensic review of thousands of documents, including the letters, memoranda, and

17  electronic corporate communications of Plaintiff and several other employees.  Defendant's review

18  of these communications revealed that Plaintiff and others had expressed concern over the legality of

19  what they were doing on behalf of Oxbow and their distrust of upper management.  As a result,

20  Defendant promoted and implemented a plan to intimidate and discredit Plaintiff for the purpose of

21  chilling his speech and damaging his credibility.

22  In early 2012, Plaintiff and other executive employees of OCM International (Larry Black,

23  Charlie Zhan, Joe Lombardi, Rich Ansley, and Bruce Taverner) were directed to attend a meeting

24  with Defendant and others at Defendant's property known as Bear Ranch located near Aspen,

25  Colorado.  Bear Ranch is accessible only through a private road owned and maintained by

26  Defendant.  The meeting was scheduled for March 21 and March 22, 2012.

27  On the morning of March 21, 2012, Plaintiff flew directly from San Francisco to Aspen.  He

28  arrived just before noon and was met at the airport by Defendant.  After lunch in Aspen, Plaintiff,

2

1   Defendant, and others drove to Bear Ranch to have dinner and spend the night.  There was no cell

2   phone reception or Wi-Fi connection at the ranch.  "As a result, [Plaintiff] had no way to

3   communicate with the outside world while he was at Bear Ranch."  (Dkt. No. 38 ¶ 18.)

4       The next morning, Plaintiff and the other guests had breakfast at the ranch followed by a

5   business meeting.  Defendant then invited Plaintiff and the other guests to tour his nearby western

6   town—a collection of approximately 50 buildings designed to replicate an authentic late-19th

7   century western town.  This was followed by a helicopter tour of the ranch and a lunch hosted by

8   Defendant in one of the town's meeting rooms.

9       Following lunch, Defendant told Plaintiff and the others that they would be interviewed by a

10  compensation specialist as part of a 360-degree peer review.  Plaintiff was then escorted to a small

11  room and interviewed "by two agents of [Defendant]" for several hours.  (*Id.* at ¶ 20.)  Plaintiff was

12  accused of participating in a wide-ranging scheme to defraud Oxbow and Defendant of millions of

13  dollars, accepting bribes from competitors, and diverting freight to a known competitor.  "These

14  accusations were based on [Plaintiff's] alleged misconduct primarily when he worked for Oxbow

15  Carbon & Minerals in Pleasant Hill, California and lived in Berkeley, California."  (*Id.*)

16      After this confrontation, at around 5:00 p.m., Plaintiff was escorted to an SUV and directed

17  to sit in the back.  Just outside the western town the vehicle stopped, the windows were rolled down,

18  and Plaintiff was served with his termination papers and a lawsuit.  As the vehicle returned to the

19  ranch, Plaintiff asked where he was being taken.  The driver told him that he would be taken to

20  Aspen.  Plaintiff was then driven to the main house on the ranch to collect his belongings.

21      When collecting his belongings, "[a]n agent of [Defendant]" searched his suitcase and

22  toiletries.  (*Id.* ¶ 19.)  Plaintiff was then escorted to an SUV and driven to a nearby cabin on the

23  ranch, where he was escorted into the cabin.  While escorting Plaintiff to the cabin, the driver told

24  Plaintiff that "a sheriff is here to make sure you don't wander off."  (*Id.*)  Plaintiff observed a

25  marked police vehicle parked nearby with a man in uniform behind the wheel.  The police vehicle

26  was clearly visible from the window of the room in which Plaintiff was kept.

27      After three hours of "being confined," (*id.* ¶ 23), Plaintiff was told to collect his things and

28  that he would be taken to an airport.  "Agents of [Defendant]" directed Plaintiff to get back in the

United States District Court
Northern District of California

3

1    SUV with a former co-worker, Charlie Zahn, while "two agents of [Defendant] sat up front." (*Id.*)

2    Plaintiff asked to be driven to Aspen, which is 69.3 miles from Bear Ranch, because he had a

3    scheduled flight from Aspen to San Francisco the next morning. This request was denied. Plaintiff

4    was told that he was being taken to Denver, which is 228 miles from Bear Ranch. Plaintiff

5    complained and stated that he wanted to go to Aspen.

6           Plaintiff was driven to a small private airport in the Denver area. Once at the airport,

7    "[Defendant's] agents" escorted Plaintiff to a private plane and ordered Plaintiff and Zahn to board

8    the plane. (*Id.* at ¶ 24.) "[Plaintiff] is informed and believes and thereupon alleges that the plane

9    was owned or controlled by [Defendant]." (*Id.*) It was now approximately 2:00 a.m. on March 23,

10   2012. The private jet was manned by a pilot, co-pilot, and an escort Plaintiff believed was armed, all

11   of whom were "agents of [Defendant]." (*Id.*) The plane landed in Oakland, California at

12   approximately 4:00 a.m. On arrival Plaintiff was told that a car was waiting to take him to a nearby

13   Marriot Courtyard Hotel. Plaintiff refused the request and asked an airport employee to call a cab.

14   A cab arrived and Plaintiff left.

15          Regarding the involvement of the sheriff in the false imprisonment, Plaintiff alleges that a

16   Colorado Bureau of Investigations report following the alleged incident at the ranch "confirm[s] that

17   the Sheriff's deputies, Deputy Clarence Hart and Deputy Mike Smith, . . . were acting as Koch's

18   agents." (*Id.* at 38 ¶ 26.) Deputy Smith sometime in March 2012 asked Deputy Hart if he would be

19   interested in doing a "security job" at Bear Ranch. (*Id.* at 38 ¶ 28 (quotation marks omitted).)

20   Deputy Smith had been approached to do the job, but he was scheduled to be on duty that day.

21   Deputy Smith told Deputy Hart that Defendant was going to fire some employees, and he wanted a

22   law enforcement presence "in case things got out of control." (*Id.* (quotation marks omitted).)

23   Deputy Hart accepted the job. When he arrived at the ranch in his patrol vehicle, a man he believed

24   to be the ranch manager named Rob Gill told Deputy Hart he would be paid $50.00 per hour.

25   Deputy Hart was at the ranch for 10 hours that day, from 10:00 a.m. to 8:00 p.m. He received a

26   $500.00 check at the end of the day. Deputy Hart was directed to park behind a cabin near the main

27   office. Deputy Hart observed two people being escorted to the cabin that day, and at the time he

28   thought they may have been terminated employees. There was a "whole security detail from

1  Florida" present on the ranch that day.  (*Id.*)  Deputy Hart estimated eight to nine men were on the

2  security detail.

3  Robert Gill, "who has been described as the Bear Ranch manager and is an agent of Koch,"

4  told Deputy Smith that on the day the executives were going to be fired, the phone service and

5  Internet access at the ranch would be turned off so "these guys couldn't uh, couldn't communicate

6  outside until they were totally done."  (*Id.* at ¶ 29 (quotation marks omitted).)  On the day Deputy

7  Hart performed the security job at the ranch, Deputy Smith spent a lot of time patrolling in that area.

8  Deputy Smith said Koch had his own "kind of like secret service type" personnel on the ranch that

9  day.  (*Id.* (quotation marks omitted).)

10  On October 11, 2012, Plaintiff filed suit against Defendant, alleging three causes of action: 1)

11  false imprisonment; 2) civil conspiracy; and 3) conspiracy under 42 U.S.C. § 1983.

**DISCUSSION**

12  **A.    Personal Jurisdiction**

13  When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the

14  burden of demonstrating that the court has jurisdiction over the defendant.  *See Harris Rutsky & Co.*

15  *Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1128-29 (9th Cir. 2003).  However, this

16  demonstration requires that the plaintiff "make only a prima facie showing of jurisdictional facts to

17  withstand the motion to dismiss."  *Doe v. Unocal*, 248 F.3d 915, 922 (9th Cir. 2001) (internal

18  citations omitted).  In such cases, "we only inquire into whether [the plaintiff's] pleadings and

19  affidavits make a prima facie showing of personal jurisdiction."  *Caruth v. Int'l Psychoanalytical*

20  *Ass'n*, 59 F.3d 126, 128 (9th Cir. 1995).  Moreover, "for the purpose of this demonstration, the court

21  resolves all disputed facts in favor of the plaintiff."  *Pebble Beach Co. v. Caddy*, 453 F.3d 1151,

22  1154 (9th Cir. 2006).

23  "Where, as here, no federal statute authorizes personal jurisdiction, the district court applies

24  the law of the state in which the court sits."  *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218,

25  1223 (9th Cir. 2011).  California's long-arm statute has the same due process requirements as the

26  federal long-arm statute.  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir.

27  2004).  The Due Process Clause requires that nonresident defendants have "minimum contact" with

28

United States District Court
Northern District of California

5

1  the forum state such that the exercise of personal jurisdiction "does not offend traditional notions of

2  fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. &*

3  *Placement*, 326 U.S. 310, 316 (1945).

4  **1.    General Jurisdiction**

5  Plaintiff argues that California has general jurisdiction over Defendant, a Florida resident.

6  The Court disagrees.   For general jurisdiction to exist over a nonresident defendant such as Koch,

7  the defendant must engage in "continuous and systematic general business contacts," *Helicopteros*

8  *Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984), that "approximate physical

9  presence" in the forum state. *Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082, 1086

10 (9th Cir. 2000). "This is an exacting standard, as it should be, because a finding of general

11 jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its

12 activities anywhere in the world." *Schwarzenegger*, 374 F.3d at 801; *see also Brand v. Menlove*

13 *Dodge*, 796 F.2d 1070, 1073 (9th Cir. 1986) (collecting cases where general jurisdiction was denied

14 despite defendants' significant contacts with forum).

15 The essence of Plaintiff's general jurisdiction argument is that to the extent any Oxbow entity

16 is found to have continuous and systematic general business contacts with California, those contacts

17 should be imputed to Defendant as the owner and ultimate authority of the Oxbow entities. [1]

18 Plaintiff provides no authority to support this proposition.   In fact, the caselaw suggests that such a

19 rule is untenable.  "[J]urisdiction over an employee does not automatically follow from jurisdiction

20 over the corporation which employs him; nor does jurisdiction over a parent corporation

21 automatically establish jurisdiction over a wholly owned subsidiary." *Keeton v. Hustler Magazine,*

22 *Inc.*, 465 U.S. 770, 781 n.13 (1984).  Rather, "[e]ach defendant's contacts with the forum State must

23 be assessed individually."  *Id.*   At the same time, courts have held in the context of specific

24 jurisdiction that the corporate form does not protect an individual acting in his official capacity in

25 two cases: "(1) where the corporation is the agent or alter ego of the individual defendant, *Flynt*

26 *Distrib. Co. v. Harvey*, 734 F.2d 1389, 1393 (9th Cir. 1984); or (2) by virtue of the individual's

27

28 [1]  Plaintiff's Opposition to the present motion purports to "incorporate . . . by reference" his
arguments regarding jurisdiction made in opposition to the initial motion to dismiss.  (Dkt. No. 45 at 6.)

United States District Court
Northern District of California

6

United States District Court
Northern District of California

1    control of, and direct participation in the alleged activities, *Transgo, Inc. v. Ajac Transmission Parts*

2    *Corp.*, 768 F.2d 1001, 1021 (9th Cir. 1985)." *Wolf Designs, Inc. v. DHR Co.*, 322 F. Supp. 2d 1065,

3    1072 (C.D. Cal. 2004); *see also Keeton*, 465 U.S. at 781 n.13 ("[W]e today reject the suggestion that

4    employees who act in their official capacity are somehow shielded from suit in their individual

5    capacity."). Here, Plaintiff does not allege that Defendant was acting in his official capacity when

6    he injured Plaintiff, so Oxbow's activities in California are irrelevant in determining whether the

7    Court has personal jurisdiction over Defendant for actions taken in his individual capacity. In

8    addition, Plaintiff does not allege that Oxbow is the agent or alter ego of Defendant. Accordingly,

9    even if an Oxbow entity is subject to general jurisdiction in California, it does not follow that

10   Defendant is also subject to such jurisdiction.

11   The remaining bases Plaintiff offers for the exercise of general jurisdiction over Defendant

12   are insufficient. Plaintiff contends that Defendant makes "periodic visits" to Oxbow offices in

13   Pleasant Hill, California and Long Beach, California. (Dkt. No. 26 at 7.) As Defendant asserts, such

14   occasional contacts do not establish general jurisdiction. *See Span Constr. & Eng'g, Inc. v.*

15   *Stephens*, 2006 WL 1883391 *6 (E.D. Cal. Jul. 7, 2006) ("In case after case, when an individual

16   conducts business that requires their occasional presence in a state, courts have not found sufficient

17   contact for general jurisdiction."). Further, Defendant's filling of an unrelated lawsuit in California

18   in 2009 may not even be considered in the jurisdictional analysis. *See Core-Vent Corp. v. Nobel*

19   *Indus. AB*, 11 F.3d 1482, 1490 (9th Cir. 1993) (filing unrelated action in forum does not subject

20   defendant to personal jurisdiction in forum); *Tercica, Inc. v. Insmed Inc.*, 2006 WL 1626930 *12

21   (N.D. Cal. Jun. 9, 2006) ("[I]t is clear from *Core-Vent* that unrelated litigation in a forum state is not

22   a controlling factor in, or even relevant to, the general jurisdictional analysis.")

23   Because Plaintiff's Complaint and declarations submitted in support of his assertion of

24   general jurisdiction fail to make the required prima facie showing, the Court finds that general

25   jurisdiction over Defendant does not exist.

26        **2.      Specific Jurisdiction**

27   Alternatively, Plaintiff argues that Defendant has sufficient "minimum contacts" with

28   California arising from his actions in falsely imprisoning Plaintiff such that the forum may assert

7

1  specific personal jurisdiction.  The Ninth Circuit employs a three-prong test ("Minimum Contact

2  Test") to determine whether a party has sufficient minimum contacts to be susceptible to specific

3  jurisdiction:

> 1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum, or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> 2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> 3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

10  *Schwarzenegger*, 374 F.3d at 802; *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1288

11  (9th Cir. 1977).  The plaintiff bears the burden of satisfying the first two prongs of this test.  *Id.*  If

12  the plaintiff satisfies this burden, the burden shifts to the defendant to make a "compelling case" that

13  the third prong—the exercise of jurisdiction is reasonable—is not met.  *Burger King Corp. v.*

14  *Rudzewicz*, 471 U.S. 462, 476-78 (1985).  "If any of the three requirements is not satisfied,

15  jurisdiction in the forum would deprive the defendant of due process of law."  *Pebble Beach Co.*,

16  453 F.3d at 1155 (internal citations and quotations omitted).  For purposes of personal jurisdiction,

17  the actions of an agent are attributable to the principal.  *See Wells Fargo & Co. v. Wells Fargo*

18  *Express Co.*, 556 F.2d 406, 419 (9th Cir. 1977).

19       The first prong of the minimum contact test "ensures that a defendant will not be haled into a

20  jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral

21  activity of another party or a third person."  *Burger King*, 471 U.S. at 475 (internal citations and

22  quotations omitted).  Under this prong, Plaintiff must establish that Defendant either purposefully

23  availed himself of the privilege of conducting activities in California, or purposefully directed his

24  activities toward California.  "A showing that a defendant purposefully availed himself of the

25  privilege of doing business in a forum state typically consists of evidence of the defendant's actions

26  *in* the forum, such as executing or performing a contract there."  *Schwarzenegger*, 374 F.3d at 802

27  (emphasis added).  By taking such actions, a defendant "purposefully avails itself of the privilege of

28  conducting activities within the forum State, thus invoking the benefits and protections of its laws."

*Id.* (internal quotation marks omitted). "A showing that a defendant purposefully directed his conduct toward a forum state, by contrast, usually consists of evidence of the defendant's actions *outside* the forum state that are directed at the forum, such as the distribution in the forum state of goods originating elsewhere." *Id.* at 803 (emphasis added). Purposeful direction allows a defendant to be haled into the forum notwithstanding a lack of any physical contacts with the forum. *See Core-Vent*, 11 F.3d at 1485 ("[W]ithin the rubric of purposeful availment the [Supreme] Court has allowed the exercise of jurisdiction over a defendant whose only contact with the forum state is the purposeful direction of a *foreign* act having *effect* in the forum state.") (emphasis original) (internal quotation marks omitted).

If purposeful direction is the proper mode of analysis, courts in the Ninth Circuit apply the three-part "effects" test traceable to the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984). *Id.* The Ninth Circuit has described *Calder* and its three-part test as follows:

> *Calder* stands for the proposition that purposeful availment is satisfied even by a defendant "whose only 'contact' with the forum state is the 'purposeful direction' of a foreign act having effect in the forum state." . . . [Under] *Calder*, the "effects" test requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.

*Id.* (alterations original).

Despite the distinction between activities in the forum state and activities outside the forum state drawn by *Schwarzenegger* and found earlier in *Core-Vent*, subsequent Ninth Circuit cases have cited *Schwarzenegger* for the proposition that "[i]n tort cases, we typically inquire whether a defendant 'purposefully direct[s] his activities' at the forum state, applying an 'effects' test that focuses on the forum in which the defendant's actions were felt, *whether or not the actions themselves occurred within the forum*." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc) (quoting *Schwarzenegger*, 374 F.3d at 803 (alterations in original)) (emphasis added); *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (quoting same). However, the Court finds no case that applied the "effects" test when the tort occurred in the forum, including *Yahoo* and *Mavrix*, which both concerned an act that was committed outside the forum. *See Yahoo*, 433 F.3d at 1209 (analyzing

9

United States District Court
Northern District of California

1   under "effects" test "intentional act" of filing suit in French court that was expressly aimed at

2   California); *Mavrix*, 647 F.3d at 1229 (applying "effects" test to an Ohio company's posting of

3   allegedly infringing photos that were expressly aimed at California).[2]

4        Instead, the "effects" test appears unnecessary where, as here, part of the alleged tort

5   occurred in California.  *See Paccar Intern., Inc. v. Commercial Bank of Kuwait, S.A.K.*, 757 F.2d

6   1058, 1064 (9th Cir. 1986) ("The commission of an intentional tort in a state is a purposeful act that

7   will satisfy the first two requirements under *Data Disc*."); *see also Olsen by Sheldon v. Gov't of*

8   *Mexico*, 729 F.2d 641, 649 (9th Cir. 1984) (finding that in claims arising from a plane's flight and

9   crash in California the first two prongs of the *Data Disc* test were "easily satisfied" where pilot of

10  aircraft in distress twice intentionally entered California airspace thereby "purposefully avail[ing]

11  itself of the benefits of operating its aircraft over California"), abrogated on other grounds by *Joseph*

12  *v. Office of Consulate Gen. of Nig.*, 830 F.2d 1018, 1026 (9th Cir. 1987); *MMCA Group, Ltd. v.*

13  *Hewlett-Packard Co.*, 2007 WL 1342586 at *7 (N.D. Cal. May 8, 2007) ("When a nonresident

14  defendant commits a tort within the state . . . that tortious conduct amounts to sufficient minimum

15  contacts with the state by the defendant to constitutionally permit courts within that state . . . to

16  exercise personal adjudicative jurisdiction . . . .") (quoting *Guidry v. U.S. Tobacco Co., Inc.*, 188

17  F.3d 619, 628 (5th Cir. 1999)); *In re Auto. Antitrust Cases I & II*, 135 Cal. App. 4th 100, 123 (2005)

18  ("California courts may properly exercise personal jurisdiction over one who commits a tort or who

19  causes a tort to be committed within this state."); *Skidmore Energy, Inc. v. Maghreb Petroleum*

20  *Exploration, S.A.*, 337 Fed. Appx. 706 at *1 (9th Cir. 2009) (unpublished) (evaluating personal

21  jurisdiction based on an allegation of an in-state tort "[e]ffects test aside").

22        This also appears to be Defendant's understanding.  Defendant states that the "effects test" is

23  applied to determine whether a nonresident defendant purposefully directed his tortious activity to

24  _____

25  [2]  Courts have stated that "[a] purposeful availment analysis is most often used in suits sounding in
    contract," *Schwarzenegger*, 374 F.3d at 802, while a purposeful direction analysis "is most often
26  used in suits sounding in tort," *id.*  However, this frequency may simply result from the fact that
    defendants in cases where the alleged tort is committed outside the forum (purposeful direction
27  analysis) challenge personal jurisdiction more often than defendants in cases where the tort is
    committed in the forum (purposeful availment analysis) since, as noted below, torts committed in the
28  forum typically satisfy the minimum contacts requirement.

1  the forum, "[i]n the absence of tortious conduct occurring in the forum." (Dkt. No. 39 at 17.)  Thus,

2  notwithstanding Ninth Circuit cases suggesting to the contrary, the Court concludes that the "effects"

3  test is unnecessary where the defendant has committed tortious acts within the forum that form the

4  basis of the plaintiff's claim.

5       The Court has little difficulty concluding that Plaintiff's allegations that Defendant

6  committed the tort of false imprisonment within the forum satisfy the prima facie requirement for

7  personal jurisdiction.  Although Plaintiff's FAC does not allege that Defendant directly participated

8  in the false imprisonment, it includes facts that support an inference that the persons who did

9  perpetrate the tort were acting as Defendant's agents.  The false imprisonment began on Defendant's

10 private ranch, where Defendant had earlier in the day hosted Plaintiff and others for lunch.  Plaintiff

11 contends his false imprisonment followed Defendant's realization that Plaintiff had discovered

12 Defendant's tax fraud; further, the false imprisonment was immediately preceded by Defendant's

13 accusation that Plaintiff had embezzled money from Defendant's companies.  Moreover, the

14 unknown individuals who falsely imprisoned Plaintiff used buildings and vehicles located on

15 Defendant's private property to commit the alleged tort.  In addition, Plaintiff alleges that the false

16 imprisonment continued unbroken as he was driven from the ranch to an airport in Denver and

17 ordered onto a private plane (alleged to be owned or controlled by Defendant) at 2:00 a.m. and flown

18 to Oakland.  Taken together, these facts lead to the plausible inference that those unnamed

19 individuals who falsely imprisoned Plaintiff were doing so as Defendant's agents, and these agents

20 continued the false imprisonment onto Defendant's plane and into the forum.

21       Defendant's proposed inference—that the plane was chartered and controlled by "any of

22 numerous other Oxbow employees (or other individuals)," (Dkt. No. 47 at 11)—while perhaps also

23 plausible, ignores the reasonable inference from the facts alleged that the Court must draw in

24 Plaintiff's favor.  It is logical to conclude that Plaintiff's false imprisonment that began on

25 Defendant's private ranch by Defendant's agents and continued unbroken until Plaintiff's release in

26 Oakland was conducted and overseen by the same person.  It is further reasonable to infer that that

27 person was Defendant.

28

At the hearing, Defendant asserted that although he directed the activities leading up to the alleged false imprisonment—the weekend retreat, the interview concerning Plaintiff's alleged embezzlement, Plaintiff's firing, etc.—it is not reasonable to infer that he also directed the actions comprising the false imprisonment allegations. Defendant reasons that those activities are not within the scope of reasonable actions an employer would take to maintain safety following the termination of an employee. The Court is not persuaded. Whether the actions alleged in the FAC amount to false imprisonment or merely reasonable actions taken by an employer to insure safety is not the inquiry for personal jurisdiction purposes. Rather, the question is whether it is plausible to infer that those persons committing the alleged actions in the forum were acting as Defendant's agents. In addition, Defendant's argument would require this Court to make determinations on the merits of this case—whether the facts alleged establish false imprisonment. The Court declines to make such determinations in light of Plaintiff's prima facie showing of personal jurisdiction. *See Data Disc*, 557 F.2d at 1289 n.6 (finding that where jurisdictional issues are intertwined with the merits and the plaintiff has made a prima facie showing, "it may be appropriate" to defer resolution of those issues until summary judgment or trial).

Because Plaintiff has adequately alleged that Defendant committed the tort of false imprisonment within the forum, the Court accordingly finds that Plaintiff has made a prima facie showing of minimum contacts needed to establish personal jurisdiction.

**B.    Venue**

**1.    Whether Venue is Proper in the Northern District**

A civil action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2). Once the propriety of venue is challenged pursuant to Rule 12(b)(3), the plaintiff bears the burden of proving that venue is proper. *Piedmont Label Co. v. Sun Garden Packing Co.*, 589 F.2d 491, 496 (9th Cir. 1979). When considering a motion to dismiss for improper venue, a court need not accept the pleadings as true and may consider facts outside of the pleadings. *Doe 1 v. AOL, LLC*, 552 F.3d 1077, 1081 (9th Cir. 2009). "[T]he court must draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts

United States District Court
Northern District of California

1    in favor of the non-moving party." *Ctr. For Food Safety v. Vilsack*, 2011 WL 996343, at *2 (N.D.

2    Cal. Mar. 17, 2011).  If the court finds venue is improper, it has discretion to dismiss or to transfer

3    venue to a proper court.  *Omnicell, Inc. v. Medacist Solutions Grp., LLC*, 272 F.R.D. 469, 473 (N.D.

4    Cal. 2011) (internal citations omitted).  Venue must be established as to each claim.  *Boudouin v.*

5    *Dep't of Navy*, 2010 WL 890042, at *2 (N.D. Cal. Mar. 8, 2010).

                        a.      **False imprisonment claim**

7           Defendant argues that venue is improper in this District because the part of the false

8    imprisonment that occurred in California does not constitute a "substantial part of the events or

9    omissions giving rise to the claim."  The Court disagrees.  Defendant cites no similar case where the

10   cause of action *itself* occurred within the forum yet the forum was improper under Section 1391.

11   Rather, Defendant's authority stands for the undisputed proposition that "[s]ubstantiality is measured

12   by considering the nexus between the events and the nature of the claims; [that is,] *significant* events

13   or *omissions* material to the plaintiff's claim must have occurred in the district in question, even if

14   other material events occurred elsewhere."  *Lee v. Corr. Corp. of Am.*, 525 F. Supp. 2d 1238, 1241

15   (D. Haw. 2007).  In *Lee*, the court rejected the plaintiff's argument that venue was proper in Hawaii

16   "because significant events *leading up to* his claims took place in Hawaii."  525 F. Supp. 2d at 1242

17   (emphasis added).  Instead, the torts the plaintiff complained of all occurred in Mississippi; no tort

18   was committed in Hawaii.  *Id.*  Here, however, the tort occurred in this District as well as in

19   Colorado.

20          Defendant's reliance on *Daniel v. American Board of Emergency Medicine*, 428 F.3d 408 (2d

21   Cir. 2005) is equally unavailing.  The plaintiffs in *Daniel* brought antitrust claims against the

22   defendant, ABEM, which were based in part on ABEM's rejections of plaintiffs' applications to take

23   its certification exam.  428 F.3d at 434.  Although the decision to reject plaintiffs' applications

24   occurred in Michigan, plaintiffs argued that venue was proper in the Western District of New York

25   because six of the 176 named plaintiffs received rejection letters in the District.  *Id.*  The court

26   rejected plaintiffs' argument, finding that such "coincidental contacts" with the forum did not

27   constitute a "substantial part" of plaintiffs' antitrust claims.  *Id.*  The court's reasoning was

28   supported by its stated principle that "[w]hen material acts or omissions within the forum bear a

close nexus to the claims, they are properly deemed 'significant' and, thus, substantial, but when a close nexus is lacking, so too is the substantiality necessary to support venue." *Id.* at 433.  While ABEM's rejection notice to six of the 176 named plaintiffs did not bear a close nexus to the plaintiffs' antitrust claims, Defendant's actions here in the forum not only bear a close nexus to the claim, they *are part of* the claim.

In addition, *Gaston v. Harris County*, 2012 WL 787202 (D. Or. Jan. 23, 2012) is distinguishable.  Gaston, proceeding *pro se*, filed a complaint against approximately 50 defendants, including companies such as Google, Inc., Lexis–Nexis Group, municipalities such as Harris County and Travis County (both in Texas) and New York City, the United States, and a number of federal agencies and officials, including the U.S. Department of Treasury, Federal Bureau of Investigation, and the Central Intelligence Agency.  *Gaston*, 2012 WL 787202 at *1.  The misconduct described in Gaston's complaint involved his allegedly discriminatory firing from his job in Texas, followed by the defendants' coordinated efforts to, among other things, defame Gaston through internet articles, stalk and harass him in the community, and attempt to murder him.  "These activities led Gaston in September 2011 to flee Texas and travel around the country in his car seeking safety.  Defendants allegedly pursued him into Arizona, California, and finally Oregon, where they 'tried to pay off a street thug to harass [Gaston] or hurt him.'"  *Id.* (alteration in original).  The court found venue in Oregon lacking because "[c]ompared with the numerous other alleged severe violations arising from events in Texas and Arizona spanning a number of years, th[e] single allegation concerning Oregon is wholly insignificant to establish venue in this district."  *Id.* at *3.  Unlike Gaston, Plaintiff is not alleging a series of disconnected and fanciful events conducted by a range of corporations and local governments and federal agencies that eventually concluded in the forum.  Rather, Plaintiff has alleged that Defendant committed the tort of false imprisonment, which simply began in one forum and ended in another.

That the majority of the false imprisonment occurred in Colorado is of no moment.  Section 1331 requires only that a "substantial" part of the events giving rise to the claim occur in the forum, not a majority of the events.  Defendant's own cited authority stands for the same proposition.  *See Daniel*, 428 F.3d at 432-33 ("'Substantiality' for venue purposes is more a qualitative than a

United States District Court
Northern District of California

14

quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts."). Moreover, the continuation of the tort into California is significant. Plaintiff alleges that he asked to be returned to Aspen where he had a scheduled flight back to California the next day; however, Defendant's agents denied Plaintiff's request and drove him that night over 200 miles to Denver and placed him on a private plane at 2:00 a.m. destined for Oakland. Based on the allegations, it can be inferred that transporting Plaintiff to California—and insuring he did not remain free in Colorado—was a motive, if not the motive, giving rise to the alleged false imprisonment.

The Court also rejects Plaintiff's argument that venue is proper in this District because a substantial part of Plaintiff's *continuing* harm is suffered by Plaintiff here at his home. While it is true that "[i]n a tort action, the locus of the injury [is] a relevant factor" in making a venue determination, *Fiore v. Walden*, 688 F.3d 558, 587 (9th Cir. 2012); *see also Myers v. Bennett Law Offices*, 238 F.3d 1068, 1076 (9th Cir. 2011), Plaintiff provides no support for the proposition that the relevant injury resulting from false imprisonment may continue indefinitely into the future. The harm incurred in being falsely imprisoned occurs during the commission of the tort; the confinement and loss of freedom harms the victim immediately. This is not a situation, as in *Myers*, where a tort is committed in one location away from the victim, but the harm is not felt until sometime later in a different location. *See Myers*, 238 F.3d at 1073-74, 1076 (finding that alleged FCRA violation, which is akin to an invasion of privacy tort, that occurred outside Nevada injured plaintiffs at their Nevada home because such privacy invasions result in mental distress experienced where the plaintiff lives).

### b.    Section 1983 claim

Venue is not proper as to Plaintiff's Section 1983 claim. The substantial events giving rise to this claim—the agreement between the deputies and Defendant; Deputy Hart's presence on the ranch—all occurred in Colorado. Plaintiff makes no allegation that any deputy was involved in returning him to California.

Nonetheless, the Court exercises pendent venue over the Section 1983 claim.  While the Ninth Circuit does not appear to have addressed the issue, courts in this District have applied the pendent venue doctrine, which holds that if venue is proper on one claim, the court may find pendent venue for claims that are closely related.  *See Legal Additions LLC v. Kowalski*, 2009 WL 1226957, at *11 (N.D. Cal. Apr. 30, 2009); *McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F. Supp. 2d 928, 965 (N.D. Cal. 2012); *see also Beattie v. United States*, 756 F.2d 91, 100–04 (D.C. Cir. 1984), *overruled on other grounds in Smith v. United States*, 507 U.S. 197 (1993).  A court may consider the principles of judicial economy, convenience, avoidance of piecemeal litigation, and fairness to the litigants in making its decision.  *See Legal Additions LLC*, 2009 WL 1226957 at *11; *McNeary-Calloway*, 863 F. Supp. 2d at 965.  These are the same factors the Ninth Circuit has directed courts to consider when evaluating whether to apply the doctrine of pendent personal jurisdiction.  *See Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1181 (9th Cir. 2004) ("When a defendant must appear in a forum to defend against one claim, it is often reasonable to compel that defendant to answer other claims in the same suit arising out of a common nucleus of operative facts. . . . "[T]he district court may have discretion to dismiss the pendent claims where considerations of judicial economy, convenience and fairness to litigants so dictate.") (alteration in original) (internal quotation marks omitted).

Defendant has not argued why granting pendent venue would lessen judicial economy, convenience, and the fairness to the litigants.  Further, because the Section 1983 claim is brought against only Defendant, and the claim encompasses many of the same events that comprise Plaintiff's false imprisonment claim, the Court finds that exercise of pendent venue is warranted.

Because a portion of the tort that is the basis of the lawsuit occurred in this District, the Court has little difficulty concluding that a "substantial part" of the events giving rise to Plaintiff's claim occurred in this District.  Defendant's motion to dismiss for improper venue is accordingly denied.

## 2.    Section 1404(a) Transfer

Even if a court finds that venue is proper, it has discretion to transfer a case to another district pursuant to 28 U.S.C. section 1404(a).  That statute provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district

or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).  When a defendant moves for a 1404(a) transfer, the defendant bears the burden to show that transfer is appropriate.  *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979).

"A motion to transfer venue under § 1404(a) requires the court to weigh multiple factors in its determination whether transfer is appropriate in a particular case."  *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000).  In particular, the Court should consider (1) the plaintiff's choice of forum; (2) the convenience of the parties; (3) the convenience of the witnesses; (4) ease of access to evidence; (5) familiarity of each forum with applicable law; (6) feasibility of consolidation of other claims; (7) any local interest in the controversy; and (8) the relative court congestion and time to trial in each forum.  *Ctr. For Biological Diversity & Pac. Env't v. Kempthorne*, 2007 WL 2023515 at *3 (N.D. Cal. July 12, 2007).

Typically the defendant must make a strong showing that transfer is appropriate to warrant upsetting the plaintiff's choice of forum.  *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986) (internal citations omitted); *see also Ctr. for Biological Diversity & Pac. Env't*, 2007 WL 2023515 at *3 (stating that unless the balance of factors weighs heavily in favor of the defendants, "the plaintiff's choice of forum should rarely be disturbed") (internal citations omitted).  Moreover, "a plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum."  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981).  However, "[i]f the operative facts have not occurred within the forum of original selection and that forum has no particular interest in the parties or the subject matter, the plaintiff's choice is entitled only to minimal consideration."  *Id.* (internal quotation marks and citation omitted).  "The degree to which courts defer to the plaintiff's venue choice is substantially reduced where the plaintiff's venue choice is not its residence or where the forum lacks a significant connection to the activities alleged in the complaint."  *Id.* (internal quotation marks and citation omitted).

Defendant moves to transfer venue to the District of Colorado.  Having considered the factors set forth above, the Court finds that transfer is a close question.  However, given that it is Defendant's burden, the Court concludes that Defendant has not demonstrated that a transfer to

United States District Court
Northern District of California

17

1    Colorado is in the interest of justice or convenience.[3]  First, Defendant's insistence that Plaintiff's

2    choice of forum should be given reduced consideration relies on his mistaken belief that the

3    wrongdoing alleged to have occurred in this District is inconsequential.  Thus, Defendant has not

4    made the strong showing that Plaintiff's choice of his home forum should be disturbed.  Second, the

5    Court is aware that the balance of the events giving rise to this lawsuit occurred in Colorado;

6    however, Defendant has not shown that the bulk of witnesses remain there.  Although the two

7    sheriff's deputies that were involved in Defendant's security operation reside in Colorado, the

8    "whole security detail from Florida" comprising eight to nine men—those Plaintiff alleges are

9    Defendant's agents—appear to reside in Florida, not Colorado.  (Dkt. No. 38 ¶ 28.)  Thus, for the

10   majority of witnesses, the District of Colorado may be only marginally more convenient, if at all,

11   than this forum.

12        In addition, Plaintiff argued at the hearing that transfer should be denied because Defendant's

13   Case Management Conference statement reveals that he intends to call OCM employees who work

14   in the Pleasanton, California office as witnesses in this case.  Those California witnesses would

15   presumably testify to Plaintiff's alleged embezzlement scheme, which, Defendant may argue,

16   provides Plaintiff a motive to launch false accusations against Defendant.  While the Court is

17   mindful that this issue may be pursued and these witnesses called at trial, the Court assigns little

18   weight to the potential witnesses' presence in this forum considering that the extent of their role, if

19   any, in trial is uncertain.

20   **C.    Failure to State a Claim[4]**

21        A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief

22   can be granted "tests the legal sufficiency of a claim."  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir.

23   2001).  Dismissal under Rule 12(b)(6) may be based on either (1) the "lack of a cognizable legal

24   theory," or (2) "the absence of sufficient facts alleged under a cognizable legal theory."  *Balistreri v.*

---

25

26   [3]  The parties do not dispute that the action could have been brought in the District of Colorado.

     [4]  Although the caption to Plaintiff's Opposition to the motions provides that Plaintiff opposes
27   Defendant's Rule 12(b)(6) motion, the body of Plaintiff's Opposition fails to include a discussion of
     that motion.  However, at the hearing, Plaintiff clarified that he does oppose the motion and asked that
28   his arguments contained in his previous opposition to Defendant's first motion to dismiss be
     incorporated into his present Opposition.  The Court grants Plaintiff's request.

*Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1988).  While "detailed factual allegations" are not required, a complaint must include sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

For purposes of ruling on a Rule 12(b)(6) motion to dismiss, the Court accepts all allegations of material fact as true and construes the pleadings in the light most favorable to the plaintiffs. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  The Court need not, however, accept as true pleadings that are no more than legal conclusions or the "formulaic recitation of the elements' of a cause of action."  *Iqbal,* 556 U.S at 663.  Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim."  *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).

###### 1.    False Imprisonment

"The tort of false imprisonment is the nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short." *Snyder v. Evangelical Orthodox Church*, 216 Cal. App. 3d 297, 303 (1989) (internal quotation marks omitted).  "A person is falsely imprisoned if he or she is wrongfully deprived of his or her freedom to leave a particular place by the conduct of another." *Id.*

Plaintiff alleges that the term of false imprisonment lasted from the time Plaintiff was ordered to wait in a cabin with a sheriff's deputy close by and in full view, until he disembarked from the airplane in Oakland and was released.  Defendant argues that Plaintiff's false imprisonment claim is insufficient because the FAC does not adequately allege "confinement."  Defendant asserts that "[Plaintiff] does not allege that at any time during the purported he asked to leave, tried to leave, expressed fear of harm or was threatened with force."  (Dkt. No. 39 at 22.)  Defendant, however, does not correctly state the standard for confinement in California.  Restraint, or confinement, "may be effectuated by means of physical force, threat of force or of arrest, confinement by physical barriers, or by means of any other form of unreasonable duress." *Fermino v. Fedco, Inc.*, 7 Cal. 4th 701, 715 (1994) (internal citations omitted).  Plaintiff claims that when the false imprisonment began

1    in a cabin on Defendant's ranch, Plaintiff observed a police vehicle parked nearby the cabin with a

2    man in uniform behind the wheel, and was told by one of Defendant's alleged agents that "[a] sheriff

3    is here to make sure you don't wander off."  (Dkt. No. 1 ¶ 19.)  Defendant does not explain how this

4    implicit threat of arrest if Plaintiff were to attempt to "wander off" fails to allege confinement.

5         In addition, after his alleged three-hour confinement in the cabin, Plaintiff was driven to a

6    Denver airport and put on a private plane at 2:00 a.m. even though he asked to be taken to the closer

7    Aspen airport where he had a scheduled flight to San Francisco the next morning.  Thus, contrary to

8    Defendant's assertion, Plaintiff did "ask[] to leave."  Plaintiff also alleges that he believed an escort

9    on the flight from Denver was armed, thus suggesting a threat of force if Plaintiff were to attempt to

10   escape.  Taking Plaintiff's allegations as true, and drawing all reasonable inferences in Plaintiff's

11   favor, the Court finds that the claimed sequence of events adequately alleges confinement.  One

12   could infer from these facts that Plaintiff was not free to leave during the time he alleges he was

13   falsely imprisoned.

14        Defendant also argues that Plaintiff's declaration submitted with his opposition to the initial

15   motion to dismiss reveals that Plaintiff cannot state a claim for false imprisonment.  In particular,

16   Defendant contends that Plaintiff's statement that he was provided a telephone while in the cabin

17   and told that he could speak on the telephone "for as long as the minutes lasted," (Dkt. No. 28 ¶ 11),

18   precludes Plaintiff's claim.  However, "[a]s a general rule, a district court may not consider any

19   material beyond the pleadings in ruling on a Rule 12(b)(6) motion."  *Lee v. City of Los Angeles*, 250

20   F.3d 668, 688 (9th Cir. 2001).

21        Even if the Court were to consider it, the Court is not persuaded that access to a telephone

22   necessarily precludes a false imprisonment claim.  Defendant's authority is not to the contrary.  In

23   *Lucterhand v. Granite Microsystems, Inc.*, 2007 WL 703400, at *16 (E.D. Wis. Mar. 02, 2007) the

24   court found no false imprisonment on a motion for summary judgment where it was undisputed that

25   the defendant "did not use or threaten to use physical force or violence or verbally or physically

26   assault" the plaintiff, who alleged that defendant did not allow him to leave work to go to the

27   hospital.  The court found that no reasonable juror could conclude that plaintiff did not have

28   "reasonable means of escape" where, among other things, the plaintiff "never used his cell phone to

20

call a friend, ambulance, or taxi to pick him up." *Id.* Rather, the only impediment to the plaintiff leaving and seeking medical attention was the plaintiff's concern that he would displease his boss, the defendant, if he left work. As an initial matter, Defendant seeks to dismiss the claim under Rule 12(b)(6); this is not a motion for summary judgment as in *Lucterhand*. Further, unlike in *Lucterhand*, Plaintiff was actually threatened with arrest, albeit implicitly. In addition, Defendant's insistence that Plaintiff could use a phone ignores that, given the circumstances, a phone provided Plaintiff with little assistance. The police were already present, and were there to make sure Plaintiff "[did not] wander off;" a taxi, presumably, would not be allowed to enter Defendant's private ranch, even if a taxi would service the secluded location. For the same reasons, Defendant's reliance on *Hanna v. Marshall Field & Co.*, is also inapposite. *See* 279 Ill. App. 3d 784, 794 (1996) (finding no false imprisonment on a motion for summary judgment where plaintiff-employee voluntarily entered her employer's office, was never threatened with the loss of her job, the meeting occurred during work hours, the door to the office was not locked, and plaintiff had access to a telephone).

### 2.    Civil Conspiracy

"Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510–511 (1994). "By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy." *Id.* at 511. A prerequisite to an action based on a conspiracy liability theory to commit a tort is the commission of the underlying tort. *Doctors' Co. v. Super. Ct.*, 49 Cal. 3d 39, 44 (1989). The elements of a civil conspiracy are (1) the formation of a group of two or more persons who agreed to a common plan or design to commit a tortious act; (2) a wrongful act committed in furtherance of the common design; and (3) resulting damages. *Applied Equip. Corp.*, 7 Cal. 4th at 511. "A claim of unlawful conspiracy must contain 'enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.'" *PQ Labs, Inc. v. Yang Qi*, 2012 WL 2061527, at *8 (N.D. Cal. June 7, 2012) (quoting *Twombly*, 550 U.S. at 556).

1    Plaintiff alleges that "Koch, DOES 1 through 25 and each of them, agreed, by words or

2    conduct, to falsely imprison Plaintiff; they did subject Plaintiff to false imprisonment; . . . and

3    Plaintiff's harm was caused by the acts of Koch, DOES 1 through 25 and each of them."  (Dkt. No.

4    38 ¶ 36.)[5]  Defendant contends that these allegations are conclusory and therefore Plaintiff's

5    conspiracy claim fails.  However, taken as a whole, Plaintiff's FAC adequately alleges a claim for

6    civil conspiracy.  As already discussed, the parties who allegedly perpetrated the tort did so on

7    Defendant's private property immediately following an "interrogation" of Plaintiff concerning his

8    alleged embezzlement from Defendant's companies.  These factual allegations plausibly suggest that

9    the actions of the Doe individuals in committing the tort resulted from an agreement between at least

10   one of those individuals and Defendant, and raise a reasonable expectation that discovery will reveal

11   evidence of the illegal agreement.

12        **3.    Conspiracy under 42 U.S.C. § 1983**

13   For a claim under 42 U.S.C. § 1983, Plaintiff must allege: (1) the action occurred "under

14   color of law" and (2) the action resulted in a deprivation of a constitutional right or a federal

15   statutory right.  *See Souders v. Lucero*, 196 F.3d 1040, 1043 (9th Cir. 1999).  To state a claim for

16   conspiracy to violate an individual's civil rights, a plaintiff must plead sufficient facts to infer "the

17   existence of an agreement or 'meeting of the minds' to violate constitutional rights."  *Mendocino*

18   *Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir. 1999) (internal quotation marks

19   omitted).  The existence of a conspiracy may be inferred when the alleged conspirators have

20   committed acts that "are unlikely to have been undertaken without an agreement."  *Id.*  No

21   heightened pleading standard applies.  *See Empress LLC v. City and County of San Francisco*, 419

22   F.3d 1052, 1056 (9th Cir. 2005) ("The federal system is one of notice pleading, and the court may

23   not apply a heightened pleading standard to plaintiff's allegations of conspiracy.").

24        Here, Plaintiff alleges that Defendant "DOES 1 through 25 and each of them, conspired with

25   other persons, including local law enforcement officers acting under color of state law, to

26   accomplish a violation of Plaintiff's constitutional rights by intentionally restricting Plaintiff's

27   

28   _____
     [5]  The paragraphs in Plaintiff's FAC are misnumbered.  Although Plaintiff's FAC states that the cited
     paragraph is "27" it is actually "36."

United States District Court
Northern District of California

1  freedom of movement." (Dkt. No. 38 ¶ 38.) Plaintiff's FAC, however, does not adequately allege

2  that there was an agreement or "meeting of the minds" between the sheriff's deputies and Defendant,

3  or Defendant's agents, to falsely imprison Plaintiff. Rather, Plaintiff's FAC simply alleges that

4  Deputy Hart was at the ranch that day for a "security job," and was told that Defendant "wanted a

5  law enforcement presence 'in case things got out of control'" while he terminated some of his

6  employees. (Dkt. No. 38 ¶ 28.) These allegations do not support an inference that the deputies and

7  Defendant conspired to violate Plaintiff's constitutional rights.

8         Although Plaintiff was told by one of Defendant's alleged agents that "[a] sheriff is here to

9  make sure you don't wander off," (Dkt. No. 38 ¶ 22), this allegation—to the extent it is claimed to

10 support the *deputy's* agreement to falsely imprison Plaintiff—conflicts with Plaintiff's allegation

11 noted above that Deputy Hart was just there "in case things got out of control." Consequently,

12 Plaintiff does not adequately allege that Deputy Hart agreed to falsely imprison Plaintiff as opposed

13 to simply agreeing to be present in case a police officer was needed while Defendant terminated his

14 employees. In addition, the allegation that one of Defendant's employees told Deputy Smith that the

15 phone and Internet service at the ranch would be turned off so "these guys couldn't . . . communicate

16 outside until they were totally done" also does not provide a basis for a reasonable inference that the

17 deputies conspired to falsely imprison Plaintiff. (*Id.* at ¶ 29.) Although Plaintiff alleges he did not

18 have access to a phone, and Deputy Smith knew this, it does not follow that the deputies also agreed

19 to confine Plaintiff.

20        The Court's conclusion that Plaintiff does not adequately allege a Section 1983 conspiracy

21 claim does not disrupt its findings above regarding Plaintiff's state law claims. While the deputies

22 may have been unaware of Defendant's false imprisonment—and, in fact, may have been mere

23 pawns in Defendant's misconduct—Plaintiff has adequately alleged that there was a separate

24 conspiracy between Defendant and his agents to falsely imprison Plaintiff, and that they did falsely

25 imprison Plaintiff.

26        Plaintiff's Section 1983 conspiracy claim is accordingly dismissed with leave to amend.

23

United States District Court
Northern District of California

**D.     Motion to Strike Punitive Damages Allegations**

Finally, Defendant moves to strike allegations regarding punitive damages from the Complaint pursuant to Federal Rule of Civil Procedure 12(f).  Rule 12(f) states that a district court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P 12(f).  Rule 12(f), however, does not authorize a district court to strike a claim for damages on the ground that such damages are precluded as a matter of law.  *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 971 (9th Cir. 2010).  This is because Rule 12(f) motions are reviewed for abuse of discretion, whereas 12(b)(6) motions are reviewed de novo.  *Id.* at 973.  If a party were to seek dismissal of a pleading (by striking claims for damages) under Rule 12(f), "the district court's action would be subject to a different standard of review than if the district court had adjudicated the same substantive action under Rule 12(b)(6)."  *Id.*  "Applying different standards of review, when the district court's underlying action is the same, does not make sense." *Id.*; *see also Finuliar v. BAC Home Loans Servicing, L.P.*, 2011 WL 4405659, at *14 (N.D. Cal. Sept. 21, 2011) (denying a Rule 12(f) request to strike a request for punitive damages under *Whittlestone*).  Defendant's Motion to Strike is accordingly denied.

## CONCLUSION

For the reasons stated, Defendant's Motion to Dismiss for Lack of Personal Jurisdiction is DENIED; Defendant's Motion to Dismiss for Improper Venue or, in the alternative, Motion to Transfer is DENIED; Defendant's Motion to Dismiss for Failure to State a Claim is GRANTED in part and DENIED in part; and Defendant's Motion to Strike is DENIED.

An amended complaint, if any, shall be filed no later than 20 days from the date of this Order.

**IT IS SO ORDERED.**

Dated: April 30, 2013

_____
JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE