1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10

11

12

KIRBY MARTENSEN,

Case No.: C-12-05257 JSC

13

**ORDER GRANTING IN PART
DEFENDANT'S MOTION FOR
PARTIAL RECONSIDERATION OF
APRIL 30, 2013 ORDER; ORDER
TRANSFERRING CASE TO THE
DISTRICT OF COLORADO**

Plaintiff,

14

v.

15

16

WILLIAM KOCH and DOES 1-25,
inclusive,

17

18

Defendant.

19

20        This action involves the alleged false imprisonment of Kirby Martensen ("Plaintiff") by

21   William Koch ("Defendant") and other unnamed parties.  Now pending before the Court is

22   Defendant's motion for partial reconsideration of the Court's April 30, 2013 Order.[1]  (Dkt. No. 71.)

23   After carefully considering the parties' pleadings on the motion, and having the benefit of oral

24   argument on August 29, 2013, the Court GRANTS in part Defendant's motion and TRANSFERS

25   this case to the District of Colorado.

26   //

27

28   _____

[1]  The Court previously granted Defendant's motion for leave to file a motion for partial
reconsideration.  (*See* Dkt. No. 67.)

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

**BACKGROUND**

**A.      Allegations of the First Amended Complaint**

Until March 22, 2012, Plaintiff, a resident of Berkeley, California, was an executive employee of companies owned and/or controlled by Defendant, including OxBow Carbon & Minerals, Inc. ("OCM"), and Oxbow Carbon & Minerals International ("OCM International"). OCM and OCM International sell a significant amount of petroleum coke and steam coal throughout Asia, shipping millions of metric tons of product to that region each year.  In late 2011, Plaintiff was promoted to the position of Senior Vice President-Asia with OCM International, and relocated to OCM International's Singapore office.  Plaintiff came to believe that the company's business efforts in Asia included implementing a plan to evade paying taxes to the United States on profits in excess of $200,000,000 per year.

Sometime in 2011, Defendant was notified of an anonymous letter alleging that Plaintiff and another employee, Larry Black, had been engaging in theft, breaches of fiduciary duty, fraud, and self-dealing against the Oxbow companies.  Based on this information, Defendant directed a comprehensive forensic review of thousands of documents, including the letters, memoranda, and electronic corporate communications of Plaintiff and several other employees.  Defendant's review of these communications revealed that Plaintiff and others had expressed concern over the legality of what they were doing on behalf of Oxbow and their distrust of upper management.  As a result, Defendant promoted and implemented a plan to intimidate and discredit Plaintiff for the purpose of chilling his speech and damaging his credibility.

In early 2012, Plaintiff and other executive employees of OCM International (Larry Black, Charlie Zhan, Joe Lombardi, Rich Ansley, and Bruce Taverner) were directed to attend a meeting with Defendant and others at Defendant's property known as Bear Ranch located near Aspen, Colorado.  Bear Ranch is accessible only through a private road owned and maintained by Defendant.  The meeting was scheduled for March 21 and March 22, 2012.

On the morning of March 21, 2012, Plaintiff flew directly from San Francisco to Aspen.  He arrived just before noon and was met at the airport by Defendant.  After lunch in Aspen, Plaintiff, Defendant, and others drove to Bear Ranch to have dinner and spend the night.  There was no cell

1    phone reception or Wi-Fi connection at the ranch.  "As a result, [Plaintiff] had no way to

2    communicate with the outside world while he was at Bear Ranch."  (Dkt. No. 38 ¶ 18.)

3              The next morning, Plaintiff and the other guests had breakfast at the ranch followed by a

4    business meeting.  Defendant then invited Plaintiff and the other guests to tour his nearby western

5    town—a collection of approximately 50 buildings designed to replicate an authentic late-19th

6    century western town.  This was followed by a helicopter tour of the ranch and a lunch hosted by

7    Defendant in one of the town's meeting rooms.

8              Following lunch, Defendant told Plaintiff and the others that they would be interviewed by a

9    compensation specialist as part of a 360-degree peer review.  Plaintiff was then escorted to a small

10   room and interviewed "by two agents of [Defendant]" for several hours.  (*Id.* at ¶ 20.)  Plaintiff was

11   accused of participating in a wide-ranging scheme to defraud Oxbow and Defendant of millions of

12   dollars, accepting bribes from competitors, and diverting freight to a known competitor.  "These

13   accusations were based on [Plaintiff's] alleged misconduct primarily when he worked for Oxbow

14   Carbon & Minerals in Pleasant Hill, California and lived in Berkeley, California."  (*Id.*)

15             After this confrontation, at around 5:00 p.m., Plaintiff was escorted to an SUV and directed

16   to sit in the back.  Just outside the western town the vehicle stopped, the windows were rolled down,

17   and Plaintiff was served with his termination papers and a lawsuit.  As the vehicle returned to the

18   ranch, Plaintiff asked where he was being taken.  The driver told him that he would be taken to

19   Aspen.  Plaintiff was then driven to the main house on the ranch to collect his belongings.

20             When collecting his belongings, "[a]n agent of [Defendant]" searched his suitcase and

21   toiletries.  (*Id.* ¶ 19.)  Plaintiff was then escorted to an SUV and driven to a nearby cabin on the

22   ranch, where he was escorted into the cabin.  While escorting Plaintiff to the cabin, the driver told

23   Plaintiff that "a sheriff is here to make sure you don't wander off."  (*Id.*)  Plaintiff observed a

24   marked police vehicle parked nearby with a man in uniform behind the wheel.  The police vehicle

25   was clearly visible from the window of the room in which Plaintiff was kept.

26             After three hours of "being confined," (*id.* ¶ 23), Plaintiff was told to collect his things and

27   that he would be taken to an airport.  "Agents of [Defendant]" directed Plaintiff to get back in the

28   SUV with a former co-worker, Charlie Zahn, while "two agents of [Defendant] sat up front."  (*Id.*)

1   Plaintiff asked to be driven to Aspen, which is 69.3 miles from Bear Ranch, because he had a

2   scheduled flight from Aspen to San Francisco the next morning.  This request was denied.  Plaintiff

3   was told that he was being taken to Denver, which is 228 miles from Bear Ranch.  Plaintiff

4   complained and stated that he wanted to go to Aspen.

5           Plaintiff was driven to a small private airport in the Denver area.  Once at the airport,

6   "[Defendant's] agents" escorted Plaintiff to a private plane and ordered Plaintiff and Zahn to board

7   the plane.  (*Id.* at ¶ 24.)  "[Plaintiff] is informed and believes and thereupon alleges that the plane

8   was owned or controlled by [Defendant]."  (*Id.*)  It was now approximately 2:00 a.m. on March 23,

9   2012.  The private jet was manned by a pilot, co-pilot, and an escort Plaintiff believed was armed, all

10  of whom were "agents of [Defendant]."  (*Id.*)  The plane landed in Oakland, California at

11  approximately 4:00 a.m.  On arrival Plaintiff was told that a car was waiting to take him to a nearby

12  Marriot Courtyard Hotel.  Plaintiff refused the request and asked an airport employee to call a cab.

13  A cab arrived and Plaintiff left.

14          On October 11, 2012, Plaintiff filed suit against Defendant, alleging three causes of action: 1)

15  false imprisonment; 2) civil conspiracy; and 3) conspiracy under 42 U.S.C. § 1983.

16      **B.      The April 30, 2013 Order**

17          Defendant filed a motion to dismiss Plaintiff's First Amended Complaint ("FAC") under (i)

18  Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction; (ii) Rule 12(b)(3) for

19  improper venue, or in the alternative, to transfer the case under 28 U.S.C. § 1404(a); and (iii) Rule

20  12(b)(6) for failure to state a claim for relief.  The Court denied Defendant's motion, except as to

21  Defendant's motion to dismiss Plaintiff's Section 1983 claim; the Court granted Defendant's motion

22  on that claim.

23          Although the Court concluded that general jurisdiction over Defendant was lacking, the

24  Court found that Plaintiff had adequately alleged a prima facie case of specific personal jurisdiction.

25  That is, the Court concluded that Plaintiff adequately alleged that Defendant had sufficient

26  "minimum contacts" with the forum: Defendant's agents' conduct in transporting Plaintiff by plane

27  into the forum.  (*See* Dkt. No. 51 at 11 ("Plaintiff alleges that the false imprisonment continued

28  unbroken as he was driven from the ranch to an airport in Denver and ordered onto a private plane

4

United States District Court
Northern District of California

1  (alleged to be owned or controlled by Defendant) at 2:00 a.m. and flown to Oakland.").)  The Court

2  rejected Defendant's argument that it was unreasonable to infer that the individuals on the plane

3  were Defendant's agents.  Because Plaintiff alleged Defendant's unlawful conduct continued into the

4  forum, Plaintiff had stated his prima facie case of specific personal jurisdiction.

5       The Court also denied Defendant's motion to dismiss for improper venue, or in the

6  alternative, to transfer the case to Colorado.  The Court concluded that venue was proper over

7  Plaintiff's false imprisonment claim because the commission of part of the tort in the forum

8  constituted a "substantial part of the events or omissions giving rise to the claim."  *See* 28 U.S.C. §

9  1391(b)(2).  Although the Court concluded that venue was not proper as to Plaintiff's Section 1983

10  claim, the Court exercised pendant venue over that claim.

11       Regarding transfer, the Court found that it was "a close question."  (Dkt. No. 51 at 17.)

12  However, the Court ultimately rejected Defendant's request for transfer because he "ha[d] not

13  demonstrated that a transfer to Colorado [wa]s in the interest of justice or convenience."  (*Id.* at 17-

14  18.)

15       Finally, the Court concluded that Plaintiff had adequately stated a claim of false

16  imprisonment and civil conspiracy, but he did not state a valid Section 1983 conspiracy claim.

17      **C.**    **New Factual Evidence Since the April 30, 2013 Order**

18       Defendant requests that this Court reconsider the issues of specific jurisdiction and venue

19  because of newly discovered evidence—in particular, Plaintiff's deposition testimony on May 16

20  and 29, 2013 in *Oxbow Carbon, LLC et al. v. Martensen et al.*, Case No. 502012CA005386, pending

21  in Circuit Court, Palm Beach County, Florida.  Defendant asserts that Plaintiff's testimony

22  "establishes that Martensen's alleged false imprisonment occurred exclusively in Colorado and that

23  no part occurred in California."  (Dkt. No. 71 at 1.)

24       The portions of Plaintiff's deposition relevant to this motion involve the transport of Plaintiff

25  from the ranch to the private Denver airport.  During the several-hour drive from the ranch to

26  Denver, the two alleged agents of Defendant who were transporting Plaintiff and non-party Charlie

27  Zhan, stopped the vehicle at a 7-11 convenience store in Carbondale, Colorado at 11:00 p.m.

28  Plaintiff's deposition included the following exchange:

Q: When Mike and John [the alleged "agents" in the vehicle] went into the 7-Eleven, it was just you and Charlie [Zhan]?

A: Yes.

Q: Did Charlie get out of the car?

A: Yes.

Q: Did he have a cigarette?

A: Yes.

Q: Did you get out of the car?

A: Yes.

Q: And you just stood there with Charlie waiting for Mike and John to come back?

A: Waiting for Mike and John to come back. At some point, I believe I went into the store and thought about getting something to eat. I don't think I did.

Q: There was an employee working?

A: Yes.

Q: When you went into the store, where were Mike and John? Had they gone back to the car?

A: I believe Mike did go back to the car and John was in the bathroom.

Q: So when you went into the 7-Eleven, John was in the bathroom?
A: I believe so.

Q: And Mike was back at the car?

A: Yes.

Q: So you were there with the employee at the 7-Eleven?

A: Yes.

Q: Did you say to the employee at the 7-Eleven, "I'm being held against my will, can you help me"?

A: No.

Q: Did you try to use the cell phone at the time you were at the 7-Eleven in Carbondale?

A: No.

Q: When Mike and John went into the 7-Eleven and it was just you and Charlie, did you attempt to walk away?

A: No.

(Dkt. No. 72-2 at 430:10-431:24.)  Plaintiff went on to explain his conduct:

> I keep it all in context.  I think that's important.  I'm being accused of a big crime by a big billionaire.  I've got two guys sitting in the front that are – they've got to be law enforcement.
> . . .
> For all intents and purposes, especially after the policeman is parked outside the front door and I'm held in a room for three-and-a-half hours and then I'm told to get in the car and we're going to Denver, not the place I want to go.  For all practical purposes, I'm under arrest and I am going to do what my jailer tells me to do.  I'm not going to resist.  That's not me.  I want this -- I want to be the most compliant acquiescent nicest guy so that I'm well treated and, hopefully, this all gets straightened out.
>
> Q: And that was a decision that you made, right?
>
> A: Absolutely, yes.
>
> Q: So nobody was forcing you to remain with them at that time, but you decided, on your own, that you wanted to remain with them in the hopes of trying to work it out at the end of the day?
>
> A: Yes, that is what I believed.

(*Id.* at 432:11-16, 433:3-21.)

Plaintiff and the other individuals eventually arrived at the Denver airport at approximately 2:00 a.m.  Plaintiff testified that once there:

> We got out of the car and collected our things and I believe Mike and John walked us up to the - pretty much the fence of the airport and you could see the plane sitting there and then there were two people by the stairs that go into the plane, and we just walked over to the plane.
>
> Q: So Mike and John dropped you off and they got back in the SUV and left, right?

United States District Court
Northern District of California

United States District Court
Northern District of California

1   A: They walked us up a little ways and then they got back in the SUV.

2   Q: So they walked you up to the entrance of the private terminal?

3   A: Correct.

4   Q: And left you, right?

5   A: Yes.

6   Q: When you went into the reception area, what did you do?  Did you use the restroom?

7   A: We didn't go to the reception area at first.  We went just directly to who I would
8   learn -- one was the pilot, I'm not sure, I guess the copilot were standing outside.  So
9   that's what we did.

10  . . .

11  I think it was the pilot had said something to the effect that you guys are really late,
12  which I had no idea we were supposed to be anywhere on time.  And then I asked
13  where are we going because, again, nobody is telling us anything that's going on and he
14  says, we're taking you to Oakland and, at this point, it's got to be somewhere between
15  two and three in the morning.  I don't know Oakland Airport that well, but I do know it
16  shuts down at some point in time and I told them there is no way you're taking us to
17  Oakland Airport.  It's closed.  He just shrugged it off and said, don't worry, we'll get
18  you there.  And here again, what are you supposed to do.

19  . . .

20  You're in the middle of nowhere.  I got -- I have to say, you know, the drive to Denver,
21  I really felt they were going to just drop us off at some local prison. I was just looking
22  for street signs saying, you know, prison, mile on the left.

23  When we get to the plane, it's not that we're going to Oakland. I didn't believe that for
24  a minute. I felt we probably, more logically, would be going to Florida where I could be
25  served more complaints, or worse.  The whole thing was so surreal.  You just can't
26  imagine why this is happening.  And I understand the point of your questions and so
27  forth, but, again, it's not that I'm just going to run off into the woods and try to hide or
28  sprint away from this airport in the middle of nowhere and leave everything behind, so
    that I can somehow rescue myself.  You're just trying to be the compliant, absolute
    polite, acquiescent subject of people who are controlling every move you're making.

    So, no, after we are assured that we are going to Oakland, I asked to use the restroom in
    the waiting area and, of course, yes.  So we go and we use the toilet and we come back.

    . . .

    Q: So you walked from the plane to the terminal to use the restroom?

8

A: Yes.

Q: Was Charlie with you at the time?

A: Yes.

Q: Who else was with you?

A: Nobody

Q: So you and Charlie walked back by yourself to the terminal to use the restroom?

A: Yes, sir.

Q: The pilot and the copilot were out at the plane at that point, right?

A: Yes.

Q: Mike and John were gone, right?

A: I actually didn't see them leave, but I'm imagining they did.

Q: You didn't see them anywhere, right?

A: I didn't see them.

Q: As far as you knew, they left, right?

A: Yes.

Q: And there was an employee working in the terminal, right?

A: Yes.

Q: When you walked back into the terminal, did you tell the employee that you were being held against your will and being taken to Oakland against your will?

A: No.

Q: Did you go up to the employee and say, "can you please call the police, I'm being kidnapped"?

A: No.

Q: Did you tell the employee that you felt like people were controlling all your actions and you needed help?

9

A: No.

Q: You had the cell phone with you at the time, right?

A: Yes.

Q: Did you try to call anybody?

A: No.

Q: Did you try to call 911?

A: No.

Q: Did you try to call the police?

A: For all the reasons I've explained, no.

Q: So you then went in to use the restroom, right?

A: Yes.

Q: Finished using the restroom?

A: Yes.

Q: And then you and Charlie walked unescorted to the plane?

A: Yes.

Q When you got back to the plane, where was the pilot and the copilot, were they back onboard at that point?

A: Somebody was outside the plane. I don't know which one it was. Somebody was outside waiting for us.

Q: Okay. And you walked out and you saw that person and you got on the plane?

A: Yes.

Q: Did that person tell you you had to get on the plane?

A: No.

Q: Did that person force you onto the plane?

A: Again, not physically, no.

Q: Did that person intimidate you into getting on the plane in any way?

A: No.

Q: Did you refuse to get on the plane?

A: No.

Q: Did you say to anyone, "I don't want to get on this plane"?

A: No, I didn't say -- no, I didn't say.

(Dkt. No. 74-8 at 441:1-447:17.)  Plaintiff had two beers on the flight and "tried eating a sandwich." (*Id.* at 452:25-453:5.)

When the plane arrived in Oakland, Plaintiff was offered a ride to a hotel, but Plaintiff declined.  When asked why he declined, Plaintiff explained: "I knew where I was. I did not want to be in anybody's control anymore, so I asked the fellow working at the airport to get me a taxi and he did."  (*Id.* at 457:15-23.)

## LEGAL STANDARD

"[A] motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law."  *389 Orange St. Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999).  A motion for reconsideration "may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000).

## DISCUSSION

### A.      Personal Jurisdiction and Proper Venue

The new evidence that has emerged since the Court's April 30, 2013 Order raises some concerns regarding the Court's personal jurisdiction over Defendant and the propriety of venue, given the apparent contradictions between Plaintiff's FAC and his deposition testimony.  The Court's personal jurisdiction conclusion was based on Plaintiff's allegation that the alleged false imprisonment continued into California; that is, "[o]nce at the private airport, Koch's agents escorted

Martensen to a private plane. . . . Koch's agents then ordered Martensen . . . to get into the private plane." (Dkt. No. 38, FAC, at ¶ 24.)  However, Plaintiff's deposition reveals that Defendant's agents did not escort Plaintiff to the private plane (they dropped him off at the gate and drove away without ensuring that Plaintiff made it to the plane), and they did not order Plaintiff to get into the private plane, (*see* Dkt. No. 74-8 at 447:5-7 ("Q: Did that person tell you you had to get on the plane? A: No.").)  Nor was Plaintiff "intimidate[d] . . . into getting on the plane in any way." (*Id.* at 447:10-12.)  The same is true for the Court's venue determination, which was based on Plaintiff's same allegations that the tort was committed in the forum.

Plaintiff does not address explicitly these contradictions; rather, Plaintiff attempts to deemphasize his testimony by arguing that opportunities for escape do not defeat a false imprisonment claim.[2]  While Plaintiff may be correct, Plaintiff's deposition testimony at least weakens Plaintiff's claim that he was falsely imprisoned while being transported into the forum.

Nonetheless, the Court is not persuaded that it can conclude that it lacks personal jurisdiction and proper venue because Plaintiff's claim for false imprisonment occurring within the forum is weak or even fails.  Neither the specific personal jurisdiction test nor the venue rule asks whether a plaintiff has stated a claim or produced sufficient evidence to support the claim.[3]  The Court's

---

[2]  Plaintiff also references the results of his polygraph examination and the deposition testimony of Lawrence Black, who was present at the ranch the day the tort occurred.  However, this evidence, even if admissible, is not relevant to the events occurring after Plaintiff left the ranch, which is what is at issue on this motion.

[3]  The Ninth Circuit employs a three-prong test ("Minimum Contact Test") to determine whether a party has sufficient minimum contacts to be susceptible to specific jurisdiction:

> 1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum, or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> 2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> 3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).

12

United States District Court
Northern District of California

1    jurisdiction and venue rulings were based on Defendant's alleged actions in this forum; the claim

2    which arose out of those allegations was, and is, presumed to be valid for jurisdiction and proper

3    venue purposes.  Defendant's alleged actions within the forum that ultimately support a prima facie

4    finding of personal jurisdiction and proper venue—Defendant's agents transporting Plaintiff into the

5    forum—remain sufficient.  Whether the record shows that those actions constitute false

6    imprisonment is a different question.

7           Although Defendant has produced no case to the contrary, the Court notes that the Ninth

8    Circuit, in an unpublished disposition, rejected a plaintiff's contention that personal jurisdiction

9    existed based on a tort committed within the forum since plaintiff failed to adequately allege an

10   element of the tort.  *See Skidmore Energy, Inc. v. Maghreb Petroleum Exploration, S.A.*, 337 Fed.

11   Appx. 706 at *1 (9th Cir. 2009) (unpublished) (citing *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481

12   F.3d 309, 314 (5th Cir. 2007) (same)).  However, given that *Skidmore* holds no precedential weight,

13   and the absence of an explanation as to why a Rule 12(b)(6)-type analysis is appropriate in analyzing

14   personal jurisdiction, the Court finds *Skidmore* unpersuasive.  Moreover, *Skidmore* is distinguishable

15   since the court there, unlike here, did not need to look outside the complaint to reach its conclusion.

16   *Id.* ("[T]he Complaint demonstrates that any misrepresentations were repudiated prior to the alleged

17   reliance.").  And, in any event, for the reasons articulated by Plaintiff at oral argument, the Court is

18   not convinced that based on Plaintiff's testimony alone it can conclude as a matter of law that the

19   alleged false imprisonment did not continue into California.

20          The Court accordingly DENIES Defendant's motion for reconsideration as to its personal

21   jurisdiction and proper venue determinations.

22          **B.      Section 1404(a) Transfer**

23          The new evidence, however, goes directly to this Court's ruling in regards to transfer of venue,

24   which the Court found was a "close question."  (Dkt. No. 51 at 17.)  For the reasons stated below, the

25   
     _____

26          Regarding venue, a civil action may be brought in "a judicial district in which a substantial
     part of the events or omissions giving rise to the claim occurred, or a substantial part of property that
27   is the subject of the action is situated."  28 U.S.C. § 1391(b)(2).

28

13

United States District Court
Northern District of California

1 Court GRANTS Defendant's motion for reconsideration and TRANSFERS this case to the District

2 Court of Colorado.

3               **1.**        **Legal standard**

4       Even if a court finds that venue is proper, it has discretion to transfer a case to another district

5 pursuant to 28 U.S.C. section 1404(a). That statute provides: "For the convenience of parties and

6 witnesses, in the interest of justice, a district court may transfer any civil action to any other district

7 or division where it might have been brought or to any district or division to which all parties have

8 consented." 28 U.S.C. § 1404(a). Under Section 1404(a), the district court has discretion "to

9 adjudicate motions for transfer according to an individualized, case-by-case consideration of

10 convenience and fairness." *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000)

11 (internal quotation marks omitted). When a defendant moves for a 1404(a) transfer, the defendant

12 bears the burden to show that transfer is appropriate. *Commodity Futures Trading Comm'n v.*

13 *Savage*, 611 F.2d 270, 279 (9th Cir. 1979).

14       "A motion to transfer venue under § 1404(a) requires the court to weigh multiple factors in its

15 determination whether transfer is appropriate in a particular case." *Jones*, 211 F.3d at 498. In

16 particular, the Court may consider: "(1) the location where the relevant agreements were negotiated

17 and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of

18 forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's

19 cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7)

20 the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8)

21 the ease of access to sources of proof." *Id.* at 498-99; *Ctr. For Biological Diversity & Pac. Env't v.*

22 *Kempthorne*, 2007 WL 2023515 at *3 (N.D. Cal. July 12, 2007) (stating that the court may also

23 consider the convenience of the parties and witnesses, feasibility of consolidation of other claims, any

24 local interest in the controversy, and the relative court congestion and time to trial in each forum).

25 Typically the defendant must make a strong showing that transfer is appropriate to warrant upsetting

26 the plaintiff's choice of forum. *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843

27 (9th Cir. 1986) (internal citations omitted); *see also Ctr. for Biological Diversity & Pac. Env't*, 2007

28 WL 2023515 at *3 (stating that unless the balance of factors weighs heavily in favor of the

United States District Court
Northern District of California

1  defendants, "the plaintiff's choice of forum should rarely be disturbed") (internal citations omitted).

2  In connection with motions to transfer, courts should only consider undisputed facts supported by

3  affidavits, depositions, stipulations or other relevant documents.  *See Midwest Precision Servs., Inc. v.*

4  *PTM Industries Corp.*, 574 F. Supp. 657, 659 (N.D. Ill. 1983)

5             **2.      Convenience and fairness factors**

6          Transfer of venue to Colorado is in the interest of justice because the convenience and

7  fairness considerations discussed in *Jones* weigh in favor of transfer.

8             **a.      The location where the relevant agreements were negotiated and
9                      executed**

10          Because there are no relevant contracts or forum selection clauses between Plaintiff and

11  Defendant, this factor does not weigh in favor of or against transferring the action.

12            **b.      The state that is most familiar with the governing law**

13          Plaintiff brings his false imprisonment and conspiracy claims pursuant to California law.

14  Because the parties have not raised choice of law issues, and because transfer under Section 1404(b)

15  should not affect the governing law, *see Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964) ("[a] change

16  of venue under § 1404(a) generally should be, with respect to state law, but a change of

17  courtrooms."), the Court presumes that California law is governing law.

18          Although this factor weighs in favor of maintaining the case in this District, the Court does not

19  assign it much weight since the Court has no reason to believe that the Colorado court would not also

20  be familiar with the law underlying Plaintiff's tort and conspiracy claims, which are not particularly

21  complex, or unique to California.

22            **c.      The plaintiff's choice of forum**

23          "[A] plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen

24  the home forum."  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981).  However, "[i]f the

25  operative facts have not occurred within the forum of original selection and that forum has no

26  particular interest in the parties or the subject matter, the plaintiff's choice is entitled only to minimal

27  consideration."  *Pacific Car and Foundry Co. v. Pence*, 403 F.2d 949, 954 (9th Cir. 1968).  "The

28  degree to which courts defer to the plaintiff's venue choice is substantially reduced where the

15

1  plaintiff's venue choice is not its residence or where the forum lacks a significant connection to the

2  activities alleged in the complaint."  *Fabus Co. v. Asiana Exp. Co.*, 2001 WL 253185, at * 1 (N.D.

3  Cal. Mar. 1, 2001).

4         Because Plaintiff has chosen his home forum, his choice is entitled to deference.  However,

5  given Plaintiff's deposition testimony, Defendant's undisputed alleged activities, at the very least,

6  lack a significant connection to the forum.  Thus, any deference afforded to Plaintiff is "substantially

7  reduced."  *Fabus Co.*, 2001 WL 253185 at *1.   Contrary to the allegations in Plaintiff's First

8  Amended Complaint, Plaintiff testified that Defendant's agents did not escort Plaintiff to the plane.

9  Plaintiff also testified that he was not ordered onto the plane in Denver.  Nor was Plaintiff intimidated

10 into getting onto the plane.  As noted above, this new evidence weakens Plaintiff's claim of false

11 imprisonment occurring within the forum, at least as compared to the FAC's allegations.  Combined

12 with the undisputed fact that the majority of the alleged false imprisonment occurred in Colorado, the

13 Court concludes that the new evidence shows that this forum lacks a significant connection to the

14 undisputed facts of this case.

15        At the hearing on the motion, Plaintiff argued for the first time that his pending motion to

16 amend the FAC to include a claim for intentional infliction of emotional distress will reaffirm this

17 forum's connection with Plaintiff's alleged claims.  The Court is not persuaded.  Plaintiff's proposed

18 claim alleges that Defendant moved Plaintiff's job from California to Singapore knowing that he was

19 going to terminate Plaintiff sometime after Plaintiff moved his family to Asia.  (Dkt. No. 76-1 ¶ 16.)

20 Plaintiff alleges that Defendant did this to intimidate Plaintiff into ending his inquiry of Defendant's

21 tax avoidance scheme.  Even if this new claim were part of Plaintiff's operative complaint, the new

22 allegations do not have a significant connection to the forum, either by themselves or in connection

23 with the other facts in the record.  The only connection to the forum is that Plaintiff and his family

24 were living here before they moved to Singapore.  Plaintiff identifies no new witnesses located in the

25 forum that would be deposed or called if the new claim were to be added.

26        The Court accordingly finds that this factor weighs in favor of maintaining the action in this

27 forum, but only slightly.

28

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

d.      **The respective parties' contacts with the forum**

While Plaintiff is a resident of the forum, Defendant does not have material contact with the forum.  As this Court discussed in its previous Order, Defendant's contacts with the forum are almost all related to his Oxbow companies, and comprise occasional visits to Oxbow offices.  (*See* Dkt. No. 51 at 7.)  The Court accordingly finds that this factor is neutral given Plaintiff's strong contacts with the forum on the one hand, and Defendant's weak contacts with the forum on the other.

c.      **The contacts relating to the plaintiff's cause of action in the chosen forum**

The Northern District of California nexus is Plaintiff's allegation that his alleged false imprisonment continued until he was "released" at the Oakland, California airport.  For the reasons already discussed, Defendant's contacts with this forum relating to Plaintiff's claims are weaker in light of Plaintiff's recent deposition testimony.  Plaintiff's FAC alleges that he was escorted to the plane and ordered to board, allegations strongly supporting a continuation of the false imprisonment alleged to have begun on Defendant's Colorado ranch.  In his recent deposition, however, Plaintiff admits that he was not forced, ordered, or even intimated into boarding the plane, suggesting (but not mandating) that the false imprisonment, if any, did not continue into California.

Further, even before the admissions in Plaintiff's deposition testimony, it was apparent that the bulk of the conduct at issue in this case occurred in Colorado: the alleged false imprisonment began at Defendant's ranch and the majority of the confinement continued in Colorado; the alleged conspiracy occurred in Colorado (and perhaps Florida) as well.  Thus, not only are the parties' contacts with this forum attenuated from the alleged tort, the parties' contacts with the proposed transfer forum are directly at issue in this case.  Accordingly, for purposes of analyzing the convenience and fairness of transfer, the Court concludes that the parties' contacts with the forum related to the cause of action weigh in favor of transfer.

d.      **The differences in the costs of litigation in the two forums**

Based on the record presently before it, the Court concludes that the cost of litigation would be less in Colorado than in the present forum.  In connection with a discovery dispute, Plaintiff notified the Court that he wishes to take the deposition of a number of witnesses located in Colorado,

17

1   including Defendant, which would require Plaintiff to make "multiple trips" to Colorado.  (Dkt. No.

2   59 at 1-2.)  At the hearing on the motion, Defendant stated that Plaintiff had noticed two depositions

3   for witnesses in Colorado.  Plaintiff also wishes to conduct a site visit of Defendant's ranch in

4   Colorado, which Defendant has agreed to in principle.  In addition, Defendant asserts that employees

5   at the 7-11 in Colorado and the Denver airport terminal are now critical witnesses in this case.

6   Further, the parties have not identified any witness, other than Plaintiff, that resides in this forum who

7   has not already been deposed.  Thus, to the extent transfer to Colorado will facilitate less-costly

8   discovery, the Court concludes that this factor weighs in favor of transfer since, as compared to this

9   forum, the vast majority of the remaining discovery is in Colorado.

10          The Court also foresees increased litigation costs from remaining in this forum, given the

11  hotly contested issues of personal jurisdiction and proper venue.  Although Plaintiff has made a

12  prima facie showing as to both, Defendant may still seek additional discovery, summary judgment,

13  and even an evidentiary hearing to further contest Plaintiff's assertions.  These potential costs are

14  eliminated if the case is transferred to Colorado, where the parties agree that personal jurisdiction

15  and venue are non-issues.  "Courts have repeatedly held that a change of venue from a forum where

16  there is a difficult question of personal jurisdiction or venue to a district where there are not such

17  uncertainties serves the interest of justice."  *Multistate Legal Studies, Inc. v. Marino*, 1996 WL

18  786124, at *11 (C.D. Cal. Nov. 4, 1996) (collecting cases); *see, e.g.*, *DataSouth Computer Corp. v.*

19  *Three Dimensional Techs., Inc.*, 719 F. Supp. 446, 453 (W.D.N.C. 1989) (transferring case from the

20  district where resolution of jurisdiction issue would "require a substantial expenditure of additional

21  resources" to district which rendered "moot the issue of personal jurisdiction"); *Donnelly v.Klosters*

22  *Rederi A/S*, 515 F. Supp. 5, 7 (E.D. Pa. 1981) ("Substantial time, money, and effort will be required

23  to determine this preliminary jurisdictional issue which [will be] rendered unnecessary if the action

24  is transferred to a [district] which has in personam jurisdiction over defendant and is a forum where

25  the action might have been brought.").  Thus, this factor weighs heavily in favor of transfer.

26  //

27  //

28  //

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

          c.       **The availability of compulsory process to compel attendance of unwilling non-party witnesses**

With rare exception, the Court's subpoena power extends only outside of this District if the place of service is "within 100 miles of the place specified for the deposition, hearing, trial, production or inspection." Fed. R. Civ. P. 45(b)(2). Because the parties' briefing has not discussed the extent to which unwilling non-party witnesses will be an issue in this action, the Court cannot determine whether this factor favors or disfavors transfer. It appears, however, that the only non-party witness who lives in this forum is Lawrence Black, who was Plaintiff's supervisor at Oxbow and was present at the ranch the day the alleged tort occurred. As already discussed, several witnesses Plaintiff and Defendant seek to depose, and possibly call as witnesses, reside in Colorado. Thus, based on just the number of witnesses in each forum, it is likely that transfer to Colorado will best ensure that all witnesses called to testify will do so, whether willing or unwilling.

          d.       **The ease of access to sources of proof**

As already discussed, Colorado is central to the majority of the events—and the evidence of those events—at issue in this litigation. In addition to Defendant's ranch and the multiple witnesses located in Colorado, Plaintiff's deposition testimony revealed, among other things, new evidence that will be more easily accessible if the case is transferred to Colorado, including evidence regarding the stop at the 7-11 and the time at the Denver airport. With the exception of Plaintiff's presence in this forum, maintaining the action in the Northern District will not facilitate access to any sources of proof. Thus, this factor weighs in favor of transfer.

Taking all of the relevant factors into consideration, the Court concludes that Defendant has shown that a transfer to Colorado is in the interest of justice and convenience.

### CONCLUSION

For the reasons stated, the Court GRANTS in part Defendant's motion for reconsideration and TRANSFERS this case to the District of Colorado.

**IT IS SO ORDERED.**

Dated: September 3, 2013

JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE

United States District Court
Northern District of California